**R.A.**

**In Re: E.A., Petitioner**

**v.**

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Sept. 9, 2011.

Decided Jan. 9, 2012.

Brenda M. Kobal, Moosic, for petitioner.

Sandra D. Boyle, Nicholson, for intervenor Wyoming County Human Services.

BEFORE: PELLEGRINI, Judge,[1] and LEAVITT, Judge, and BUTLER, Judge.[2]

OPINION BY Judge LEAVITT.

R.A. (Father) petitions for review of an adjudication of the Department of Public Welfare, Bureau of Hearings and Appeals (Bureau) denying his request to expunge an indicated report of child abuse of E.A., his daughter (Daughter). The Bureau's factual finding that Father abused Daughter was based upon a single, videotaped interview of Daughter taken in another state, of which Father had no advance notice. Father contends that this hearsay statement did not constitute substantial evidence to support the finding that he abused Daughter and that he was denied due process.

Daughter was born January 25, 2005. She lives with her mother, J.A. (Mother), in Broome County, New York, but spends time with Father, who lives in Wyoming County, Pennsylvania. Father and Mother never married and, by all accounts, have a contentious relationship, fraught with support and visitation disputes.

On June 22, 2009, Mother contacted Broome County, New York Children and Youth (New York Agency) to report that she believed that Daughter, age four, had been sexually abused by Father. Mother reported that several days earlier she found Daughter lying on her bed wearing a dress, but no underwear, and holding a doll's head next to her genital area. When asked what she was doing, Daughter responded "Daddy does this." Because Daughter's visits with Father took place in Pennsylvania, New York Agency referred the matter to Wyoming County Children and Youth (Wyoming County).

1. The decision in this case was reached prior to January 7, 2012, when Judge Pellegrini became President Judge.

2. The case was decided before Judge Butler's term ended on January 2, 2012.

■ Jessica Dunfee, a caseworker with Wyoming County, requested the New York authorities to interview Daughter, and this was done on June 26, 2009, at the New York Children's Advocacy Center. Diane Hall, of the New York State Police, conducted the interview, and Jessica Osterhout, of New York Agency, watched it on a closed circuit television. Osterhout sent Dunfee a DVD of the televised interview and a copy of her notes of the interview. On August 25, 2009, Dunfee filed a report of "indicated" sexual abuse against Father.[3]

Father appealed, requesting the report be expunged. The Bureau appointed a hearing officer to conduct a hearing on the expungement request. Three days of hearings took place between March 2010 and July 2010.

At the first day of the hearing, Father requested a continuance so that he could find counsel. His prior counsel, engaged to represent him in a criminal investigation of Mother's charges of child abuse, decided not to handle the expungement appeal. The hearing officer denied the request and then conducted an *in camera* hearing to determine whether Wyoming County would be allowed to present the DVD recording of Daughter's interview in New York in lieu of her testimony at the expungement hearing.

At the *in camera* proceeding, Hall, of the New York State Police, testified by telephone. Hall explained the New York Advocacy Center's procedures for interviewing children believed to be victims of child abuse. Hall opined that Daughter appeared competent and credible in the course of the one-hour interview. Hall reported that Daughter identified her genital region as both a "we[e]nie" and "butt" and stated that Father "licked her front butt and her back butt." Notes of Testimony, 3/15/10 at 27 (N.T. ——/——/10 at ____); Reproduced Record at 17 (R.R. ——). Hall further reported that Daughter said Father "put his butt inside her butt" and that it hurt when he did so. Hall stopped the interview when Daughter became emotional.

Mother testified in person. She stated that it would be emotionally harmful for Daughter to testify. She explained that Daughter had never testified at a hearing and had spoken only to Hall about the incidents. Further, when Mother brought Daughter to speak with the Wyoming County attorney, Daughter was not forthcoming. Based on this experience, Mother did not think Daughter would be responsive to questioning in a hearing. Finally, Mother testified that lately Daughter gets easily emotional. Although Daughter had been brought to meet with Wyoming County on an earlier occasion, she was not present for an *in camera* interview by the hearing officer. The adjudication does not explain why Mother did not produce Daughter for questioning by the hearing

---

**3.** The Child Protective Services Law (Child Services Law), 23 Pa.C.S. §§ 6301–6385, provides for three types of child abuse reports: founded, indicated, and unfounded. *See* 23 Pa.C.S. § 6303. An "indicated report" is defined as:

A child abuse report made ... if an investigation by the county agency or the Department of Public Welfare determines that substantial evidence of the alleged abuse exists based on any of the following:

(1) Available medical evidence.
(2) The child protective service investigation.
(3) An admission of the acts of abuse by the perpetrator.

*Id.* Thus, an indicated report of child abuse under the Child Services Law may be proper in a situation where no criminal charges have been filed. *F.R. v. Department of Public Welfare,* 4 A.3d 779, 787 (Pa.Cmwlth.2010).

officer or why the hearing officer did not request a personal interview of the child.[4]

At the conclusion of the *in camera* hearing, the hearing officer determined that the New York DVD recording would be admissible in lieu of Daughter's testimony. Father did not object to the admission of the New York DVD. The hearing then proceeded to the merits of the case with Wyoming County presenting evidence in support of its burden of proving that the expungement request should be denied.

Mother testified first, acknowledging her contentious relationship with Father. She stated that Father visits Daughter every other weekend and some holidays. He picks Daughter up, and drops her off, at her parents' house. Mother repeated her account of the incident that caused her to contact New York Agency.

On Father's cross-examination, Mother acknowledged that Daughter had called Mother's former boyfriend "daddy." Mother conceded that her memory of the incident where she found Daughter with the doll was weak. Accordingly, she told Dunfee the incident took place during the day but told Hall and Osterhout it took place on the Friday night before Daughter's next visit with Father. She also changed her story about whether Daughter was in a dress or nightgown when found with the doll and about what prompted her to enter Daughter's room on the day or evening in question. Mother conceded that notwithstanding Daughter's shocking disclosure, she did not try to stop Daughter's next scheduled visit with Father.

Dunfee of Wyoming County testified in person. She stated that her review of the DVD recording of the New York interview

and Osterhout's notes summarizing that interview prompted her to file an indicated sexual abuse report against Father. The report stated that Father "put his butt in [Daughter's] butt," noting that "child called her vagina a butt and a penis a butt." Certified Record, Exhibit C–1, at 2 (C.R. ——). The report stated that Father also committed vaginal penetration with his fingers and "performed cunnilingus on child while in her bed for the night." *Id.* Dunfee stated that because New York Agency conducted the interview, no one from Wyoming County interviewed either Daughter or Mother. Dunfee contacted Father on August 11, 2010, to arrange an interview, but he declined to be interviewed on advice of counsel.

Osterhout testified by telephone about Daughter's interview, which she had observed. Osterhout noted that Hall began by asking Daughter questions such as whether she knew the alphabet, colors and could count; Daughter responded affirmatively to these questions. Osterhout believed that Hall established that Daughter knew the difference between a lie and the truth. When Hall asked Daughter about Father, Osterhout reported that Daughter spontaneously stated that he put his "butt" in her "butt" and did not want to visit him anymore because he did bad things. N.T. 3/15/10 at 114; R.R. 39. At other points in the one-hour interview, Osterhout reported that Daughter stated that Father was "rubbing and rubbing," which hurt her and caused her to cry. N.T. 3/15/10 at 118; R.R. 40. Osterhout reported that Daughter stated that "daddy's pee came out" onto, or near, her vagina. *Id.* Then they got in the tub to clean up. Finally, Osterhout reported that Daughter stated that

---

4. The *in camera* proceeding allows the hearing officer to question a child victim outside the presence of the alleged perpetrator. The Judicial Code allows the hearing officer to "observe" or "question" the child victim and require the alleged perpetrator not to be present. 42 Pa.C.S. § 5986(a)(2).

Father got into bed with her while she was sleeping and unzipped her pajamas and licked her front and back. Osterhout opined that Daughter was telling the truth because Daughter was clear and consistent in her statements.

The hearing next convened in April, at which time the New York DVD was viewed, for the first time, by the hearing officer. By that point, Father had retained counsel, who represented him in the remainder of the proceeding. Wyoming County did not prepare a written transcript of the interview. However, it offered Osterhout's notes recording Hall's interview of Daughter. C.R., Exhibit 3.

Wyoming County called its final witness, Andrew Gennken, who is a full-time deputy with the Susquehanna County Sheriff's Department and a part-time patrolman with the Montrose Borough Police. He testified that on two occasions he had been present for the transfer of Daughter to Father at the house of Mother's parents. He stated that on both occasions, Daughter was hysterical and did not go with Father willingly.

Father then testified in support of his expungement request. He elaborated on his contentious relationship with Mother. He stated that every time he picked up Daughter, a fight would take place that caused Daughter to cry. On numerous occasions, he called the police to intervene. He blamed Mother for the problem, noting that she would scream, call him names and refuse to hand over Daughter. The transfers became peaceable for a while after Mother was held in contempt of court. Father stated that Daughter always calmed down within blocks of the transfer point.

Father explained that because of his military service,[5] there were long periods of time when he did not see Daughter. He stated that he works as a mechanic for the military and that G.A., his wife, works at the county courthouse. At one point, he stopped paying support because Mother would not let him see Daughter. He testified that Mother has been threatening him with a termination of his visitation rights.

Father categorically denied all claims of sexual abuse. He testified that during visitations, his wife bathes Daughter; that Daughter wears pull-up pajamas, not zip-up pajamas, at his house; and that it is impossible to put more than 100 pounds in Daughter's bed because of its construction. He stated that he cooperated with the Pennsylvania State Police investigation, and it has not filed criminal charges. Father stated that Daughter uses the term "butt" to refer to the buttocks, and not to any other body part, and that he never heard Daughter use the term "we[e]nie" or "nuts," as she did in the interview. Father declined the opportunity to have supervised visits with Daughter because he believed that to do so would suggest that Mother's sexual abuse charges had some validity.

At the third and final day of the hearing in July, Father offered the testimony of his mother, F.A. (Grandmother), who testified that Daughter always behaved normally during visits and demonstrated no fear of Father. She confirmed that at the transfers she attended, Daughter quickly calmed down once she was beyond the influence of Mother. Grandmother reiterated that Daughter used the term "butt" to refer to her buttocks and that she had never heard Daughter use the term "nut" or "we[e]nie," which were terms used in Hall's interview. Grandmother stated that, aside from one instance when Daughter had a urinary tract infection, she had

---

**5.** Father is a member of the Pennsylvania National Guard.

never noticed any redness at or near Daughter's genitals. Her testimony corroborated that of Mother, who had attributed Daughter's occasional redness to her child's inability to "wipe effectively." C.R., Exhibit C–3. Finally, Grandmother testified that Daughter told her that the son of Mother's boyfriend, "Little R.," would "change her" and saw her naked. N.T. 7/12/10 at 14; R.R. 172. When Grandmother asked what she meant, Daughter stood up and wiggled her buttocks. Grandmother testified that she did not pursue the issue further.

The hearing officer [6] made the following findings of fact:

12. During the interview, [Daughter] identified both her vaginal area and anal area as her "butt", referring to her vaginal area as her "front butt" and her anal area as her "back butt".

13. [Daughter] stated that her father licked her "front butt" and "back butt", that [Father] placed his fingers in her "butt", that [Father] put his "butt" inside her "butt", and that the aforementioned behavior hurt her vagina, but that [Daughter] couldn't put a band-aid on the injury.

14. During the interview, [Daughter] identified the [Father] as the perpetrator of sexual abuse on her.

\* \* \*

16. At the Fair Hearing, [Daughter] was deemed unavailable to testify.

17. [Daughter's] statements from the video-taped interview were permissible.

18. [Daughter's] statements were determined credible, relevant, and that the timing, content, and circumstances of the statements provide a sufficient indicia of reliability.

19. The testimony of Ms. Hall is credible.

20. The testimony of [Mother] is credible.

21. The testimony of Ms. Dunfee is credible.

22. The testimony of Ms. Osterhout is credible.

23. The testimony of [Grandmother] is credible.

24. The testimony of [Father] is not credible.

▮▮▮▮ Proposed Report, Findings of Fact ¶¶ 12–24; R.R. 4–5. Concluding that substantial evidence supported the finding that Father had sexually abused Daughter, the hearing officer recommended that expungement be denied. The Bureau adopted the hearing officer's recommendation, and Father petitioned for this Court's review [7]

On appeal, Father presents three questions for our review. First, he asserts that allowing the New York DVD of Daughter's

---

**6.** The recommended adjudication was signed by James L. Bobeck, Esquire, but the hearing was conducted by Barbara Shadic Nause, Esquire. It is not known which hearing officer drafted the recommended adjudication.

**7.** Our review determines whether legal error has been committed, whether constitutional rights have been violated, or whether the necessary findings of fact are supported by substantial evidence. *F.R.,* 4 A.3d at 782 n. 7. In

determining whether substantial evidence exists, we must give the party in whose favor the decision was rendered the benefit of all reasonable and logical inferences that may be drawn from the evidence of record; however, the weight and credibility to be accorded to the evidence is solely within the province of the fact finder. *Id.* at 783. In expungement proceedings the Bureau is the ultimate fact finder. *Id.* at 781 n. 3.

interview to be admitted into evidence under the tender years exception to the hearsay rule violated his constitutional right to confront witnesses against him. Second, Father contends that the hearing officer erred, procedurally, in admitting the New York DVD and determining that Daughter was unavailable to testify without having first talked to Daughter. Third, Father argues that the critical factual findings that he sexually abused his daughter are not supported by substantial evidence. He contends that the content of Daughter's hearsay statement shows that it was not reliable. It shows that Daughter was coached in her responses and that her responses to questions were inconsistent and at times fantastic. Most importantly, Wyoming County did not offer any evidence to corroborate Daughter's hearsay statement.

■ We begin with the third issue, *i.e.,* whether substantial evidence supports the Bureau's finding that Father sexually assaulted Daughter. Father argues that Daughter's New York out-of-court statement was not reliable and that the testimony of Hall and Osterhout, which simply restated Daughter's interview, did not corroborate this hearsay statement. Wyoming County responds just the contrary: the New York DVD was reliable evidence and the New York witnesses confirmed its validity.

We begin with a review of the law applicable to the admissibility and weight to be given an out-of-court statement of a child in an expungement case. The Judicial Code creates an exception to the hearsay rule for statements made by a child describing acts of sexual abuse. Section 5986 states as follows:

(a) General rule.—*A statement made by a child describing acts and attempted acts of indecent contact, sexual intercourse or deviate sexual intercourse* performed with or on the child by another, *not otherwise admissible by statute or court ruling, is admissible in evidence in a dependency proceeding* initiated under Chapter 63 (relating to juvenile matters), involving that child or other members of that child's family, *if:*

(1) *the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability;* and

(2) the child either:

(i) testifies at the proceeding; or

(ii) is found by the court to be unavailable as a witness.

(b) Emotional distress.—In order to make a finding under subsection (a)(2)(ii) that the child is unavailable as a witness, the court must determine, based on evidence presented to it, that *testimony by the child as a witness will result in the child suffering serious emotional distress that would substantially impair the child's ability to reasonably communicate.* In making this determination, the court may do all of the following:

(1) Observe and question the child, either inside or outside the courtroom.

(2) Hear testimony of a parent or custodian or any other person, such as a person who has dealt with the child in a medical or therapeutic setting.

(c) Counsel and confrontation.—If the court hears testimony in connection with making a finding under subsection (a)(2)(ii), all of the following apply:

(1) Except as provided in paragraph (2), the defendant, the attorney for

the defendant and the attorney for the Commonwealth have the right to be present.

(2) If the court observes or questions the child, the court shall not permit the defendant to be present.

42 Pa.C.S. § 5986 (emphasis added). This rule was enacted for dependency proceedings but is followed in administrative hearings in expungement requests. *See L.W.B. v. Sosnowski,* 117 Pa.Cmwlth. 120, 543 A.2d 1241, 1245–1246 (1988). The leading case considering the admissibility of such hearsay statements is *A.Y. v. Department of Public Welfare,* 537 Pa. 116, 641 A.2d 1148 (1994).

In *A.Y.* our Supreme Court held that the out-of-court statements of a child victim of sexual assault, such as those made in a videotaped interview, are admissible in an expungement case so long as the provisions in Section 5986 of the Judicial Code are satisfied.[8] In *A.Y.* a 23–year old recent college graduate, A.Y., was accused of sexually abusing a three-year old child she had babysat. The child told her parents that A.Y. had licked her genitals. The child's parents took the child to a family intervention center where she was interviewed by representatives of the center and the county children and youth agency. A.Y. was also interviewed. The county filed an indicated report of child abuse against A.Y., which effectively derailed her intended career path in family and child counseling. A.Y. requested an expungement, and it was denied after a hearing. This Court affirmed, and A.Y. appealed to the Pennsylvania Supreme Court.

The Supreme Court observed that "[c]hild abuse cases pose unique problems of proof, especially where there exists no

independent physical evidence of abuse." *Id.* at 124, 641 A.2d at 1152. It concluded that a child's hearsay statement cannot be categorically banned, but it also reiterated that "an accused person ... is not without his or her rights to due process" in a matter "of the most serious nature." *Id.* Accordingly, it cautioned that generally hearsay evidence should not "constitute sufficient substantive evidence to register an individual citizen on a black list'...." *Id.* With respect to A.Y., the Supreme Court summarized the injustice she had suffered as follows:

[A.Y.'s] name was placed on a statewide registry without there having been any adjudication; then when appellant was required to institute an expungement proceeding, the Agency was able to justify its action without producing the victim, any independent corroborative evidence, any recording of the victim's interview, not even a verbatim transcript of the victim's statement. *Instead, the Agency was able to rely on its own employees' recitation of what the three-year old child stated had occurred. The effect of this procedure was to totally deny the appellant the ability to review or challenge the evidence against her, and perhaps more importantly, it prevented the hearing officer from having any opportunity to judge the evidence except through the prism provided by the Agency. We think more is required.*

*Id.* at 125, 641 A.2d at 1152 (emphasis added).

The Supreme Court reversed and remanded. In doing so, it formulated guidelines regarding the admission of hearsay evidence and what constitutes substantial

---

8. In *D.P. v. Department of Public Welfare,* 733 A.2d 661, 665 (Pa.Cmwlth.1999), we clarified that, although the Supreme Court in *A.Y.* considered a different version of Section 5986 of the Judicial Code, 42 Pa.C.S. § 5986, that section continues to govern the use of a child's hearsay statement in expungement cases.

evidence in these cases. Specifically, the Supreme Court stated that:

1. Hearsay testimony of a child victim will be admitted in accordance with the standards set forth in 42 Pa.C.S. § 5986, and this rule shall be applied to permit the testimony of the victim's parents and other family members as well as those professionals charged with investigating incidents of child abuse;

2. *Hearsay testimony in conjunction with admissible corroborative evidence of the act(s) in question can in toto constitute substantial evidence* which will satisfy the Agency's burden to justify a conclusion of abuse.

3. However, uncorroborated hearsay cannot satisfy the Agency's burden unless it comports with the following requirements:

   a) the statement was accurately recorded by audio or video equipment;

   b) the audio-visual record discloses the identity and at all times included the images and/or voices of all individuals present during the interview of the minor; and

   c) *the statement was not made in response to questioning calculated to lead the minor to make a particular statement and was not the product of improper suggestion.*

*Id.* at 126, 641 A.2d at 1153 (emphasis added).

It goes without saying that Daughter's videotaped interview is hearsay. Leaving aside the question of whether the New York DVD was admissible under 42 Pa. C.S. § 5986, Father contends that Daughter's hearsay statement was not competent under the Supreme Court's above-cited

test. This is because Hall's questions were suggestive of answers, and Daughter's responses showed signs of coaching. For example, early in the interview, when Hall asked Daughter for her father's name, Daughter stated that Father "was bad because he put his butt in my butt … That is why I do not want to go there anymore." New York DVD 2:53–2:59. Daughter said "Maybe I forgot that part at my house" when talking about Father's butt touching her. New York DVD 3:00–3:02. Father maintains that these statements alone show that someone went over Daughter's story at her house before the interview. In addition, by repeatedly asking Daughter about "nuts, butts, and we[e]nies," Hall prompted Daughter's responses.

Father notes inconsistencies in Daughter's interview. Daughter stated that pee came out of a weenie, then stated it did not, and then that it was only a little pee because he did not make it to the bathroom.[9] Daughter stated that Father licked her "front and back butt," but she also stated his two family dogs did exactly the same thing. She stated that Father kissed a cow's butt. She stated that Father's wife also licked her, was there when Father hurt her and that the three of them bathed together. Daughter then changed her mind about her stepmother's presence and participation. Daughter said the events took place "years ago" and "a couple days ago."

In his brief, Father notes that Daughter's understanding of the word "lick" was not clear. Daughter's answer to "what does lick mean" was "someone gets in trouble." New York DVD 3:18. Her answer to "what part of his body does he use to lick" was "his back" and "the back of his

---

9. Hall repeatedly asked Daughter for the color of this "pee" and Daughter responded "yellow" each time.

butt." *Id.* Father notes that even a four-year old knows the difference between a tongue and a buttock. Father theorizes that Daughter's disjointed answers and bizarre statements were caused by the interviewer's failure to allow Daughter to speak naturally on her own terms.

Daughter told Hall that Mother does not like Father, "so I don't go there anymore." New York DVD 3:18. However, Hall did not follow up on that statement. She did not inquire into whether Daughter was trying to please Mother. Hall did not inquire into the conduct of "Big R.," who is Mother's current boyfriend, or his son "Little R.," even though Daughter stated they were at Mother's house a lot of the time.

The Supreme Court's guidelines in *A.Y.* appear to allow that, in special situations, uncorroborated hearsay testimony of a child can constitute substantial evidence of child abuse. We have been unable, however, to find a single instance of an indicated report of abuse being based upon a single, out-of-court statement of a child of any age, let alone a child of four years. Daughter's statements of sexual abuse involve Father, Father's wife, a cow and dogs. Her statements ramble, describing incidents that took place under a bed and in her bed, years ago or several days ago. Daughter's statement is simply not competent to stand as the sole support of a finding of sexual abuse.

█ Wyoming County argues that Daughter's statement is not the only evidence of Father's sexual abuse. It insists that Daughter's statement was corroborated by the testimony of Hall and Osterhout. Father argues that testimony from persons whose only experience with Daughter was attendance at the interview is not corroboration. We agree.

Testimony from Hall and Osterhout about what Daughter said at her interview is double hearsay that was redundant, not corroborative, of the New York DVD. Hearsay can not constitute independent corroborative evidence of hearsay. *A.P. v. Department of Public Welfare,* 696 A.2d 912, 916 (Pa.Cmwlth.1997). In short, there was no corroboration to support the Bureau's finding that Father sexually assaulted Daughter.

As noted, there is no prior case where a court has allowed a child's uncorroborated hearsay statement to serve as the sole evidence to support a factual finding of child abuse. Indeed, county agencies routinely offer corroborating evidence. In *C.E. v. Department of Public Welfare,* 917 A.2d 348, 351 (Pa.Cmwlth.2007), for example, the county agency offered testimony from the emergency room physician who treated the child as corroborating evidence.[10] *See also A.O. v. Department of Public Welfare,* 838 A.2d 35 (Pa.Cmwlth. 2003) (testimony of physician with expertise in sexually abused children offered to corroborate hearsay statements of child victim); *Mortimore v. Department of Public Welfare,* 697 A.2d 1031 (Pa.Cmwlth. 1997) (testimony of physician offered to corroborate hearsay statement of child victim of sexual abuse); *D.P.,* 733 A.2d 661 (testimony of child psychiatrist and medical doctor offered to corroborate hearing statement of child victim, although the child's statement was held inadmissible). Wyoming County offered no comparable evidence to corroborate Daughter's out-of-court statement that Father, as well as his wife and family dogs, had subjected her to various acts of defilement. The evidence

---

**10.** Ultimately, this Court held the admission of the out-of-court testimony was in error because the hearing officer did not make a determination that the child was unavailable as a witness pursuant to 42 Pa.C.S. § 5986. *C.E.,* 917 A.2d at 356.

Wyoming County claims to be corroboration was only more hearsay.

■ Where the hearsay statement is that of a very young child, corroboration is needed to find that a perpetrator engaged in sexual intercourse, cunnilingus and digital penetration of the child, as was reported here by Wyoming County. A medical examination to confirm vaginal penetration and an investigation of Daughter's living situation in New York, to consider what other persons had an opportunity to abuse Daughter in the past, should have been undertaken. This is not the exceptional case where uncorroborated hearsay alone may be sufficient to justify a finding of abuse.

■ In his second issue, Father contends that the hearing officer erred, procedurally, in ruling that the New York DVD was admissible in lieu of Daughter's testimony. We agree.

The ruling was made before the hearing officer reviewed the New York DVD. A stenographer did not transcribe the videotaped interview, so the hearing officer did not have a written transcript available at the *in camera* hearing. Instead, the hearing officer relied upon the telephonic statements of Hall, the interviewer, for a recital of what Daughter said in the interview. Hall's opinion that the videotaped interview of Daughter satisfied the requirements of 42 Pa.C.S. § 5986(a)(1) was beside the point. It is the job of the factfinder to ensure "that the time, *content* and circumstances of the statement provide sufficient indicia of reliability...." 42 Pa.C.S. § 5986(a)(1) (emphasis added). This requires a review of the hearsay statement to determine its admissibility.

Here, the factfinder relied upon Hall's testimony in admitting the New York DVD in lieu of Daughter's testimony. This was

error. Hall's testimony was appropriate for establishing the time and circumstances of Daughter's statement. However, only by viewing the New York DVD could the hearing officer determine whether the *content* of Daughter's statement demonstrated sufficient indicia of reliability to warrant its admission. By admitting the New York DVD on the basis of Hall's statement of what it contained, the hearing officer repeated the mistake identified in *A.Y.*:

> [T]he Agency was able to rely on its own employees' recitation of what the three-year old child stated had occurred ... [This] procedure ... *prevented the hearing officer from having any opportunity to judge the evidence except through the prism provided by the Agency.*

*A.Y.* at 125, 641 A.2d at 1152 (emphasis added). Likewise here, the hearing officer decided the admissibility of the New York DVD "through the prism provided by" Wyoming County.

The hearing officer criticized Father for not providing "significant contradictory evidence." Adjudication at 9. This was not Father's burden. We do not require litigants to prove a negative because it cannot be done. It was Wyoming County's duty to investigate the serious allegations made by Mother, and it did not do so. It relied entirely upon New York personnel, for whose work Wyoming County could not vouch. Wyoming County did not investigate Father's background, character, reputation or family or offer any evidence such as a physical exam or evaluation of a physician or psychologist to corroborate the New York DVD hearsay statement.

Accordingly, we conclude that substantial evidence does not support the factual finding that Father committed a sexual assault and, therefore, reverse.[11]

*ORDER*

AND NOW, this 9th day of January, 2012, the order of the Department of Public Welfare, Bureau of Hearings and Appeals, dated March 10, 2011, in the above-captioned matter is hereby REVERSED.

11.  In light of this holding, we need not ad-    dress Father's constitutional issue.