IN THE COMMONWEALTH COURT OF PENNSYLVANIA

T.K. and M.K., : 
         Petitioners : 
  : **CASE SEALED**
     v. : No. 1029 C.D. 2016
  : Submitted: January 27, 2017
Department of Human Services, : 
         Respondent : 

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE JAMES GARDNER COLINS, Senior Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY PRESIDENT JUDGE LEAVITT             FILED: May 8, 2017

       T.K. (Father) and M.K. (Mother) (collectively, Parents) petition for review of an adjudication of the Pennsylvania Department of Human Services (Department), Bureau of Hearings and Appeals (Bureau), that adopted an Administrative Law Judge's recommendation to deny Parents' request to expunge an indicated report of abuse of their son, L.K. (Child), from the ChildLine Registry.[1] Parents argue that the indicated report was untimely filed under Section 6337(b) of the Child Protective Services Law (Law),[2] 23 Pa. C.S. §6337(b), and must be expunged. They further argue that the evidence of intervenor County Children and Youth Services (CYS) was insufficient to establish a presumption of

---

[1] ChildLine, a unit within the Department, operates a statewide system for receiving reports of suspected child abuse; refers the reports for investigation; and maintains the reports for reference. 55 Pa. Code §3490.4.

[2] 23 Pa. C.S. §§6301-6386.

abuse under Section 6381(d) of the Law, 23 Pa. C.S. §6381(d). We agree and reverse.

## Background

Father and Mother are married and the biological parents of Child and his brother, who is two years older. On December 20, 2014, when Child was approximately four months old, Parents took him and his brother to their on-call pediatrician's office for their persistent cough and congestion. The on-call pediatrician (On-Call Pediatrician) examined them and ordered a chest x-ray. Child's x-ray revealed "healing left lateral 6th and 7th rib fractures," which, according to the physician who reviewed the x-ray, "raises concern for nonaccidental trauma and further investigation is required." Certified Record (C.R.) Item 4, Exhibit C-6, at 4. Both children were then transferred to the emergency room for a skeletal x-ray. The tests were negative, except that Child's report revealed the same "healing or healed fracture of the left seventh rib … with what appears to represent a more recent fracture of the adjacent sixth rib." C.R. Item 4, Exhibit C-6, at 7. No other fractures were identified. Child then underwent a retina scan and a CT scan for signs of Shaken Baby Syndrome or other kinds of abuse; both results were negative.

On December 20, 2014, CYS received a report of suspected child abuse related to Child's rib fractures.[3] C.R. Item 4, Exhibit C-1. A caseworker conducted an investigation. On-Call Pediatrician, who examined Child on

---

[3] Although the record shows that a written notice of suspected child abuse was sent to CYS on December 23, 2014 (C.R. Item 4, Exhibit C-1), the parties agreed, and the ALJ found, that CYS received a phone call from ChildLine with the allegation of abuse on December 20, 2014. ALJ Opinion (11/2/2015) at 5.

2

December 20, 2014, was then hired by the Children's Advocacy Center to review the matter. Parents proposed two potential causes of the rib fractures. They explained that Child had recently fallen off a bed when the family was in New York for Thanksgiving. Parents consulted with Father's sister, who is a physician, and she told them that it was unnecessary to visit the emergency room. Parents also explained that Child's brother jumped on Child on at least two or three occasions, when he attempted to use a "bouncy chair" in which Child was sitting. These incidents caused Child to cry.

On-Call Pediatrician prepared a report on behalf of the Children's Advocacy Center, which report stated, in relevant part, as follows:

> Chart reviewed completed and negative … Chest x-ray done on 02/12/2014 revealing healing left lateral 6th and 7th rib fractures. Reading was performed by Dr. Eric Vilbert. Skeletal survey performed by Dr. Weimer was negative with the exception of again anterior lateral left 6th and 7th rib fractures with what appeared to represent a more recent fracture of the adjacent sixth rib. No other fractures identified. Review of x-rays performed by Dr. Faruq, Geisinger Medical Center radiology, in agreement with readings. CAT scan of the head performed on 12/29/2014 was within normal limits. Laboratory workup including calcium phosphorus, alkaline phosphatase, parathyroid hormone, vitamin D within normal limits. Ophthalmologic evaluation performed by Dr. Wilson, Geisinger Medical Center, reportedly within normal limits.

C.R. Item 4, Exhibit C-6, at 2. The report concluded as follows:

> A 4-month-old white male with anterior lateral rib fracture of ribs sixth and seventh possibly of different ages. Those injuries are inconsistent with the history of the mechanism reported and are highly suspicious for nonaccidental trauma. Case reviewed with [Consulting Physician who is] in agreement with evaluation and medical conclusion.

3

C.R. Item 4, Exhibit C-6, at 2-3.

On January 8, 2015, a multidisciplinary investigative team[4] met to discuss Child's case and recommended that CYS file an indicated report of child abuse. On January 22, 2015, CYS filed an indicated report with ChildLine listing the perpetrator as "unknown." C.R. Item 4, Exhibit C-2, at 1. The report, filed on Form CY-48, stated:

> Child had injuries which could not have been caused by himself, and for which there was no explanation which was supported by medical opinion. A specific, known perpetrator could not be identified[,] however. Although the parents are the sole caretakers, there was no other evidence to identify either as the perpetrator. Report is indicated against Unknown.

C.R. Item 4, Exhibit C-2, at 2.

ChildLine rejected the report because it did not identify a perpetrator. On March 19, 2015, CYS decided to amend the initial report by identifying Parents as the perpetrators. The report, again filed on Form CY-48, stated:

> Indicated on both parents. Child had injuries which could not have been caused by himself, and for which there was no explanation which was supported by medical opinion. The parents are the sole caretakers.

C.R. Item 4, Exhibit C-3, at 2.

---

[4] By way of background, Section 6365 of the Law provides that the county agency shall make available among its services a multidisciplinary review team for the prevention, investigation, and treatment of child abuse. It further provides that the multidisciplinary investigative team shall be used to coordinate child abuse investigations between county agencies and law enforcement. The multidisciplinary investigative team shall consist of individuals and agencies responsible for investigating the abuse or for providing services to the child, including health care providers, county caseworkers, and law enforcement officials. 23 Pa. C.S. §6365(b)-(c).

On April 3, 2015, the Department notified Parents that they were listed as perpetrators of physical abuse of Child in the ChildLine Registry. Parents appealed. On June 8, 2015, a hearing was held before an Administrative Law Judge (ALJ). CYS presented testimony from the CYS caseworker (Caseworker), who conducted the investigation, and from On-Call Pediatrician. Parents presented testimony from a board-certified pediatric radiologist (Radiologist) and Child's regular treating pediatrician (Treating Pediatrician). Parents also testified.

Caseworker testified that she visited Parents at the hospital and again at their home, and they "continued to say that they couldn't think of any way this [injury] could have happened unless it was from either [Child's brother] jumping on [Child] when he was in his bouncy chair, or from the fall off the bed that occurred in New York State." Notes of Testimony, 6/8/2015, at 40 (N.T. __). Caseworker testified that she talked to Father's sister, a physician, who confirmed that she examined Child and did not believe he needed emergency room treatment.[5] N.T. 74-75. Caseworker testified that she saw the "bouncy chair" during the home visit and described it as a little chair that sits on the floor. Caseworker described the chair as metal framed, coated in plastic and covered with fabric.

Caseworker testified that Parents informed her that they were the sole caretakers of Child. She observed that Child's two-year-old brother appeared to be in good health; the house was safe; and the boys were "healthy and clean." N.T. 70. She also testified that she spoke to the daycare attended by Child's brother, which reported no concerns. She also spoke to Child's pediatricians and was told

---

[5] At the hearing, the parties stipulated that Father's sister examined Child shortly after he fell off the bed and did not see anything "amiss." N.T. 149-50.

that Child had never missed wellness visits. Caseworker testified that a safety plan had been undertaken during the investigation but was later terminated because there were no ongoing safety concerns for either child.

Caseworker testified that at the January 8, 2015, multidisciplinary investigative team meeting, On-Call Pediatrician opined that the rib fractures could not have been caused in either of the two ways Parents suggested. The District Attorney, who was also present at the meeting, stated that there was insufficient evidence to charge Parents. Caseworker testified that the District Attorney's assessment was a "significant factor" in the team's recommendation that CYS file an indicated report listing an unknown perpetrator. N.T. 78.

Caseworker testified that she contacted the police "because [she was] required to notify police in [such] instances"; however, she had not heard back from the police at the time she prepared the report. N.T. 30; 48. She testified that on January 21, 2015, right before she filed the report with ChildLine, she visited Parents again, telling them that "[CYS was] going to be indicating the case on unknown perpetrator, and that technically … would mean [that] the report would be unfounded against them." N.T. 49.

Caseworker further testified that before she filed the report, she contacted ChildLine to see if any additional paperwork was needed to indicate unknown perpetrators; she was told that a Form CY-48 was enough. N.T. 54. After she filed the report, however, ChildLine informed her that CYS could not indicate unknown perpetrators but should rather "either … unfound or indicate both parents. [CYS] can't have it both ways." N.T. 77. This prompted CYS to convene a meeting on March 19, 2015, and then name Parents as perpetrators. The District Attorney was not at the March meeting. Following the meeting,

6

Caseworker filed a new Form CY-48 naming Parents as perpetrators, with the intent to replace "the one that [she] submitted in January that ChildLine rejected." N.T. 57. She testified that between January 22, 2015, and March 19, 2015, CYS did not receive new evidence.

On-Call Pediatrician testified that under her contract with the Children's Advocacy Center, she does medical examinations for any child who is referred there for suspected physical or sexual abuse. She was trained in evaluating physical abuse in medical school and for "more than 17 years, [she had] always maintained some educational expertise in [] physical abuse." N.T. 96. On-Call Pediatrician testified that she received "in-depth training of physical and sexual abuse … through the regional CAC [Children's Advocacy Center] training." N.T. 96.

On-Call Pediatrician testified that she reviewed Child's medical record with Consulting Physician, who is a "nationally renowned expert in child abuse." N.T. 87-88. She testified that she sent Consulting Physician the examination report, which included the proposed mechanism of injury (*i.e.*, falling off the bed onto the floor), without sending her the x-ray images. As a result of this consultation, On-Call Pediatrician concluded that "[t]he mechanism of trauma was not consistent with the findings of a rib fracture." N.T. 89. She testified:

> Rib fractures typically on a [] child with normal bones will only occur with an abnormal force of squeezing or compression or a crush injury such as a motor-vehicle accident.
>
> We do have, as well, lab reports as far as bone fragility testing, calcium phosphorus, alkaline phosphorus, that are all within normal limits, including vitamin D, testifying to the fact that his bones are normal, in addition to he has no other fractures on the skeletal survey.

7

N.T. 90. On-Call Pediatrician testified that the report she prepared was based on her own training and expertise and that she conferred with other physicians "to confirm [her] opinion." N.T. 99.

On-Call Pediatrician also testified that Child could not have been injured by his brother jumping on him in the bouncy chair. She explained: "Again, you're not having a significant compression or squeezing force. That bouncy chair is very flexible, so there's not a hard force … that would cause fracture of the ribs." N.T. 91. On-Call Pediatrician opined that "injuries such as this … are highly specific for abuse." N.T. 93. She explained:

> The most recent article from the American Academy of Pediatrics, which is a compilation of research, has indicated that rib fractures are high specificity in regards to child abuse with specifically infants. Mainly because of the developmental age, they're unable to cause any injuries to themselves.
>
> And, again, there was no neurologic or radiologic evidence of bone disease. Multiple rib fractures are concerning for physical abuse. Fractures that are sequential, meaning as in this case, ribs six and seven, could be where placement of the fingers were creating that anterior/posterior compression causing the rib fracture.

N.T. 92.

On-Call Pediatrician testified that she could rule out the possibility of inherited diseases and "all other matters that would come up in the differential for causes for this case[.]" N.T. 96-97. She testified that a child would experience severe pain at the time of the rib fracture and would scream continuously. On-Call Pediatrician opined that Parents should be identified as perpetrators of abuse of Child.

8

On cross-examination, On-Call Pediatrician conceded that rib fractures could indicate either an accidental trauma or a non-accidental trauma. She testified:

[Question]: And you cannot look at an x-ray and actually tell from the x-ray whether that particular bone … is a strong bone or a weak bone. You can tell really weak bones, but in the middle, you can't. Is that not correct?

[Answer]: Correct.

* * *

[Question]: And since we don't know the actual structure of the bone, how weak or how strong it is, we wouldn't be able to give any reasonable opinions about how much force it would take to cause rib fractures in [Child]; isn't that correct?

[Answer]: Correct. But at the same time, [Child] had no other fractures of any of his other bones.

[Question]: No, I understand that. And so if a child has an older sibling and that sibling jumps or lands or causes some force to the child, that can explain an accidental injury, can it not?

[Answer]: If there is an anterior/posterior [front and back] compression.

[Question]: Sure. So what you're saying is the fall [off] the bed does not describe it, but you can't tell us how, in fact,[] to a reasonable degree of medical certainty how this injury occurred; is that correct?

[Answer]: Correct.

* * *

[Question]: So the actual read of an x-ray is not diagnostic for abuse; is that not correct?

9

[Answer]:  Correct.

* * *

[Question]:  And you would agree with [Radiologist's] report, that just because there might be … a difference in the callus of each fracture, that's not the diagnostic of two separate injuries. Is that not correct?

[Answer]:  That it's difficult to ascertain that fact, correct.

[Question]:  Right.  So we can say within a reasonable degree of medical certainty that we have two rib fractures that could have happened in one incident.  Is that not right?

[Answer]:  It could have happened in one incident.  It could have happened in two incidents.

[Question]:  Right.  And that it could have happened from the trauma that's accidental or non-accidental?

[Answer]:  Correct.

N.T. 102-05.   The parties stipulated that the cause of the injury was not demonstrated by the medical exams.

Radiologist, who is board-certified in pediatric radiology, testified for Parents.  She stated that the x-ray images appear to show that "[o]ne fracture … [is] probably a complete fracture and the other may have been incomplete because [she] can only see the callus on one side of it."  N.T. 115.  Radiologist testified that a callus, a healing response to bone fractures, starts to form "anywhere from a couple of weeks to a month or more" after the fracture.  N.T. 115.  Therefore, "[the fractures were] not just a few days of age."  N.T. 115.  Beyond that, Radiologist testified, she was not able to be precise.

Radiologist testified that, because the injured ribs are right next to each other, "the likelihood is that [the fractures] occurred together."  N.T. 115-16.

10

Radiologist agreed with On-Call Pediatrician that rib fractures could indicate either an accidental trauma or a non-accidental trauma:

> [Question]: Okay. Now, taking a look at those x-rays, are those x-rays diagnostic, in and of themselves, a non-accidental trauma to a four month old?
>
> [Answer]: Absolutely not.
>
> [Question]: And can you explain that? ….
>
> [Answer]: X-rays can only tell you about the … imaging presence or absence of certain types of anatomic findings. So on an x-ray, I can say a fracture is present. I can tell you if it's healing. I can sometimes give a rough estimate of dates, but beyond that, there's nothing about the x-ray that can tell us anything about whether they were inflicted ....
>
> So for an inflicted injury – I think I sent you the references. Those children have been diagnosed, again, not by x-ray, but by evidence from a wide variety of sources. Bone fractures tend to be greater in number. It's often associated with additional injuries, and from my review of the records these were isolated.
>
> * * *
>
> [Question]: Okay. So … medical evidence that takes it more to a conclusion of a non-accidental injury includes something more than two rib fractures; is that not correct?
>
> [Answer]: Well, again, x-rays can't tell you anything about intent…. So you have to look at the context of other things. In this case, there was additional imaging evaluation. That was negative…. X-rays are simply images. They can't tell you anything – from the x-ray of this. I don't have additional factors that would suggest abuse. All I have are two rib fractures….

N.T. 116-18.

11

Treating Physician, Child's primary treating pediatrician, also testified for Parents. He and On-Call Pediatrician are partners in the same pediatric group, and he is the medical director of the Children's Advocacy Center. Treating Physician testified that he had seen both Child and his brother for most of their wellness visits and some of their sick visits. Parents brought both children in on a regular basis. He testified that "[he] typically see[s] a baby two or three days after they [sic] leave the hospital, and then a two-week visit and a two-months visit." N.T. 141. Regarding Child's general health, Treating Physician testified that "[o]verall, [Child] had been healthy. His biggest issue had been … some eczema issues, but other than that, he'd been healthy and appropriate on all their visits." N.T. 141. Treating Physician also testified to the rib fractures:

> [Question]: So after the work-up had been done and the testing had been done, did your opinion change as to whether you had any concern regarding the parents and their care of their son?
>
> [Answer]: Any time that you have rib fractures that are unexplained, it always is a concern for non-accidental trauma. Personally, I did not have specific concerns with [Child]'s parents, but … nobody knew where these came from, and how they were obtained, so it puts everybody that had had contact with him as a potential inflictor of this.

N.T. 143. Treating Physician further testified that rib fractures in young children are difficult to detect:

> Sometimes they have just generalized fussiness. Sometimes there is … physical findings … where they had significant trauma to their chest. Sometimes it's unknown, basically an incidental finding with something else … a respiratory illness where you happen to find something like this.

N.T. 145.

12

Parents also testified. Mother testified that she had been a "stay-at-home mom" since her pregnancy with Child. N.T. 154. She did not notice "any sort of fussiness" in the past months that would have led her to think that Child may have rib fractures. N.T. 156. When she learned of the fractures, she was "absolutely heartbroken, very shocked." N.T. 156. Both Parents denied that they had ever abused Child or his brother.

Father testified that Child fell off of a bed when the family was in New York at his father's house for Thanksgiving. Father placed Child on the bed and briefly left the room; he heard a thump and rushed back, finding Child crying on the floor on his stomach. Father testified that "[Child] was crying more loudly than I had ever heard him cry before." N.T. 182. Father testified he did not believe that Child could fall, and he "was very surprised [that] he did fall." N.T. 181. Father then took Child to the other room; laid him on the bed; and checked his condition including pulse, pupils, and bones. Father testified that he had taken classes in first aid and was "current in CPR [cardiopulmonary resuscitation], [but] not advanced first aid." N.T. 182. Father thought Child was okay but he called his sister, a physician, who checked Child the next day. She concluded Child was fine. Father testified that he did not notice anything "out of the ordinary" thereafter. N.T. 184.

Mother testified that Child was "crying pretty hard for several minutes" after the fall. N.T. 158. She "tried to nurse him, which he nursed right away. And after that, he was fine and then he slept fine, too." N.T. 158-59. Mother testified that the bed Child fell from was king-size and at least two and a half to three feet high. The floor was carpeted.

13

Parents also testified that Child's brother was seen jumping onto Child several times while Child was propped up in a bouncy chair. According to Mother, Child's brother "would just run across the room and jump on top of him." N.T. 163. Father testified that they "would catch him most of the time, but not every time." N.T. 180.

The ALJ recommended sustaining Parents' appeal. He found that both the January 22, 2015, and March 19, 2015, indicated reports were defective. The January 22, 2015, report, the ALJ reasoned, should have identified a perpetrator of the alleged abuse; ChildLine had rejected the filing for the same reason. As to the March 19, 2015, report, it was not filed within the 60-day timeframe under Section 6337(b) of the Law, 23 Pa. C.S. §6337(b). Accordingly, the ALJ concluded that the report must be deemed unfounded. ALJ Opinion (11/2/2015) at 5. By order dated November 4, 2015, the Bureau adopted the ALJ's recommendation in its entirety.

CYS requested reconsideration, claiming that it had timely filed the indicated report on January 22, 2015, and the March 19, 2015, report was an amendment, not a new report. Further, CYS argued that it was allowed to list an unknown perpetrator in an indicated report. On November 20, 2015, the Secretary of Human Services granted reconsideration and remanded the case to the Bureau to decide the merits of the matter. The parties requested that the appeals be adjudicated based on the June 8, 2015, hearing transcripts and the briefs filed.

On remand, the ALJ reversed his prior recommendation. Crediting the testimony of On-Call Pediatrician and Radiologist, the ALJ found that Child's ribs were likely injured at the same time. At least one rib was completely fractured, which "would have been extremely painful when it occurred." ALJ

14

Opinion (5/26/2016) at 13. The ALJ further found that unexplained rib fractures in an infant are highly suspicious for abuse because an infant's ribs are highly elastic and difficult to break. No evidence, the ALJ found, suggested that Child had a medical condition or history of being involved in a vehicular accident or other non-abuse event involving significant forces that could explain the rib fractures.

Discrediting Parents' testimony, the ALJ found their two possible explanations implausible because neither involved sufficient force to compress Child's chest and fracture his ribs. The ALJ reasoned that one expects head or clavicle injuries to occur in a fall. Further, Child did not cry continuously after either incident; rather, Parents described that he was quickly consoled. The ALJ concluded that, "[a]s no plausible accidental explanation for the serious physical injuries was provided after non-abuse medical or congenital explanations were excluded, and the injuries would have caused the child to experience severe pain … CYS provided substantial evidence that the subject child was the victim of physical child abuse." ALJ Opinion (5/26/2016) at 12.

The ALJ further concluded that CYS demonstrated by substantial evidence that the presumption under Section 6381(d) of the Law should apply to find that Parents abused Child. 23 Pa. C.S. §6381(d). Further, Parents failed to overcome the presumption that one of them abused Child by offering a plausible explanation for Child's injuries. Accordingly, the ALJ recommended that Parents' appeal be denied. On June 2, 2016, the Bureau adopted the ALJ's proposed adjudication in its entirety. Parents then filed the subject petition for review with this Court.

15

**Appeal**

On appeal,[6] Parents raise two issues. They first argue that the Bureau erred in denying their expungement request because CYS's March 19, 2015, report was filed well beyond the 60-day deadline under Section 6337(b) of the Law, 23 Pa. C.S. §6337(b). Second, Parents argue that the Bureau erred in finding that CYS provided substantial evidence that Child's rib fractures were the result of abuse. We address these issues *seriatim*.

**I.**

In their first issue, Parents argue that the Bureau erred in denying their expungement request because CYS did not file an indicated report against them until March 19, 2015, which was well beyond the 60-day deadline imposed by Section 6337(b) of the Law. Failure to file a report within the statutory timeframe, Parents argue, rendered the report unfounded. CYS counters that it timely filed an indicated report on January 22, 2015; the March 19, 2015, report simply amended the previous report to identify the perpetrators. CYS further argues that the 60-day period did not begin to run until "the agency [CYS] reported a named perpetrator to ChildLine." CYS Brief at 11. Parents respond that if the March 19, 2015, report was indeed an amendment, it should have been filed on Form CY-49.

We begin with an examination of the law relevant to the timeliness of an indicated report. Section 6337(b) of the Law provides:

---

[6] "This Court's review is limited to determining whether legal error has been committed, whether constitutional rights have been violated, or whether the necessary findings of fact are supported by substantial evidence." *T.H. v. Department of Human Services*, 145 A.3d 1191, 1196 n. 6 (Pa. Cmwlth. 2016) (quoting *F.R. v. Department of Public Welfare*, 4 A.3d 779, 782 n.7 (Pa. Cmwlth. 2010)). Whether a county agency's evidence satisfied the evidentiary standard set forth in the statute is a question of law. *In re S.H.*, 96 A.3d 448, 455 (Pa. Cmwlth. 2014).

(b) Absence of other determination. – *If an investigation of a report of suspected child abuse conducted by the appropriate county agency pursuant to this chapter does not determine within 60 days of the date of the initial report of the instance of suspected child abuse that the report is a founded report, an indicated report or an unfounded report*, or unless within that same 60-day period court action has been initiated and is responsible for the delay, *the report shall be considered to be an unfounded report*, and all information identifying the subjects of the report shall be expunged no later than 120 days following the expiration of one year after the date the report was received by the department….

23 Pa. C.S. §6337(b) (emphasis added). In accordance with Section 6337(b), Section 3490.69 of the Department's regulations provides that, "[w]hen the CY-48 form is not filed with ChildLine within 60-calendar days of receipt of the report by ChildLine, the report shall be unfounded." 55 Pa. Code §3490.69. This Court has construed this provision to mean that a report is deemed unfounded when a county agency fails to file the report as founded, indicated, or unfounded within the 60-day deadline. *J.C. v. Department of Public Welfare*, 138 A.3d 57, 62 n. 16 (Pa. Cmwlth. 2016).

The Department's regulations also provide a procedure for a county agency to amend a founded or indicated report. Section 3490.67(d) of the Department regulations states:

(d) *A supplemental child abuse report form shall be submitted* to ChildLine on founded and indicated reports *when additional case information is obtained*, including dates of birth, *identity of the subjects*, additional information about the nature of the abuse, or the case is presented before a court and there is a change in the status of the report.

17

55 Pa. Code §3490.67(d) (emphasis added). The Department has designated Form CY-49 as "Child Protective Service Supplemental Report."[7]

The parties do not dispute, and the ALJ found, that in this case CYS intended to file an indicated report. Section 6303(a) of the Law defines an "indicated report" as:

> [A] report of child abuse made pursuant to this chapter if an investigation by the department or county agency determines that substantial evidence of the alleged abuse by a perpetrator exists based on any of the following:
>
> (i)   Available medical evidence.
>
> (ii)   The child protective service investigation.
>
> (iii) An admission of the acts of abuse by the perpetrator.

23 Pa. C.S. §6303(a). Effective December 31, 2014, an indicated report based on (i) or (ii) may list the perpetrator as "unknown" if "substantial evidence of abuse by a perpetrator exists, but the department or county agency is unable to identify the specific perpetrator." 23 Pa. C.S. §6303(a), added by Act of December 18, 2013, P.L. 1170.

Here, CYS received a report of suspected abuse of Child on December 20, 2014; it filed an indicated report with ChildLine on January 22, 2015, listing the perpetrators as "unknown." This filing was permitted under Section 6303(a), which had become effective on December 31, 2014. Nevertheless, ChildLine rejected the filing[8] based upon former Section 6303, which required identification

---

[7] *See* 55 Pa. Code §3490.91(a)(5)(i).

[8] The ALJ found that ChildLine had rejected CYS's January 22, 2015, indicated report. ALJ Opinion (5/26/2016) at 5, Finding of Fact No. 38. This finding, as part of the ALJ's **(Footnote continued on the next page . . .)**

of a specific perpetrator of the alleged abuse. Regardless of whether ChildLine's interpretation of the Law was reasonable under the circumstances, the January 22, 2015, report had been rejected and, as a result, could not be amended.

Further, the March 19, 2015, report was filed on a Form CY-48. The Department regulation provides that, to amend a previously filed report, "*[a] supplemental child abuse report form shall be submitted* to ChildLine on founded and indicated reports when additional case information is obtained…." 55 Pa. Code §3490.67(d) (emphasis added). Form CY-49 is the designated supplemental child abuse report form. Furthermore, between January 8, 2015, and March 19, 2015, CYS did not obtain additional information on the cause of Child's rib injuries or that indicated Parents were perpetrators of abuse.

For the above reasons, we conclude that the March 19, 2015, report was not an amendment to the January 22, 2015, report, which had been rejected and, thus, no longer existed. The March 19, 2015, indicated report constituted a new filing.

The March 19, 2015, indicated report was untimely. CYS received the report of suspected abuse on December 20, 2014. Nearly 90 days passed before CYS filed the indicated report on March 19, 2015. Under Section 6337(b) of the Law, the report had to be filed within 60 days of the initial report of abuse. 23 Pa. C.S. §6337(b). Because the report was untimely, it should have been deemed unfounded under Section 6337(b) of the Law, 23 Pa. C.S. §6337(b), and its accompanying regulation, 55 Pa. Code §3490.69.

---

**(continued . . .)**

Recommendation, was adopted by the Bureau on June 2, 2016. The parties do not contest this finding on appeal before this Court.

19

**II.**

Parents argue, next, that the Bureau erred in finding that CYS provided substantial evidence that Child's rib fractures resulted from abuse. They contend that the evidence presented by both parties showed that rib fractures can be caused by either accidental or non-accidental trauma. Further, Parents argue, the Bureau erred in applying the presumption of abuse because the evidence established only a suspicion of abuse. By doing so, the Bureau improperly shifted the burden of proof to Parents. The Department responds that substantial evidence existed to establish a *prima facie* case of child abuse because every medical witness testified that rib fractures are significant injuries caused by strong force that will cause severe pain. Further, Parents did not offer a plausible explanation as to how Child's injury occurred and therefore failed to rebut the presumption of abuse.

An indicated report is issued by a county agency or the Department if, after an investigation, "'substantial evidence' of the alleged abuse exists based on available medical evidence, the child protective services investigation, or an admission of the facts of abuse by the perpetrator." *G.V. v. Department of Public Welfare*, 91 A.3d 667, 671 (Pa. 2014) (quoting 23 Pa. C.S. §6303(a)). Section 6303(a) of the Law defines "substantial evidence" as "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." 23 Pa. C.S. §6303(a). Further, Section 6303(b.1) defines the term "child abuse" as follows:

> The term "child abuse" shall mean *intentionally, knowingly or recklessly* doing any of the following:
>
> (1) Causing bodily injury to a child through any recent act or failure to act.

20

*****

    (5)  Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.

*****

    (7)  Causing serious physical neglect of a child.

23 Pa. C.S. §6303(b.1) (emphasis added).[9]  Section 6303(c) of the Law recites the requirement for finding an individual culpable of child abuse as follows:

> Conduct that causes injury or harm to a child or creates a risk of injury or harm to a child shall not be considered child abuse if there is no evidence that the person acted intentionally, knowingly or recklessly when causing the injury or harm to the child or creating a risk of injury or harm to the child.

23 Pa. C.S. §6303(c).

The "substantial evidence" standard, as articulated under Section 6303(a) of the Law, is "the equivalent of the preponderance of the evidence standard." *T.H. v. Department of Human Services*, 145 A.3d 1191, 1198 (Pa. Cmwlth. 2016).  CYS bears the burden of showing that the indicated report of abuse is accurate and is consistent with the Law.  *Id.*; 23 Pa. C.S. §6341(c).

Section 6381(d) of the Law establishes a presumption of child abuse in certain cases.  It states:

---

[9] At the time the alleged abuse occurred in this case, the Child Protective Services Law defined "child abuse," in relevant part, as "any recent act or failure to act by a perpetrator which causes nonaccidental serious physical injury to a child under 18 years of age." 23 Pa. C.S. §6303. This definition was amended to the current version quoted in the body of this opinion, effective December 31, 2014, to broaden the term "child abuse" significantly. Act of December 18, 2013, P.L. 1170; *see also In re L.Z.*, 111 A.3d 1164, 1168 n.3 (Pa. 2015). In this case, CYS filed the indicated report with ChildLine after December 31, 2014, when the current version of Section 6303 was in effect. Therefore, the indicated report at issue is governed by the current, rather than the previous, version of Section 6303 of the Law.

21

> (d) Prima facie evidence of abuse. – Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parents or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa. C.S. §6381(d). *Prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." *In re L.Z.*, 111 A.3d 1164, 1185 (Pa. 2015) (quoting BLACK'S LAW DICTIONARY 825 (6th ed. abridged 1991)). "[E]vidence that a child suffered injury that would not ordinarily be sustained but for the acts or omissions of the parent or responsible person is sufficient to establish that the parent or responsible person perpetrated that abuse unless the parent or responsible person rebuts the presumption. The parent or responsible person may present evidence demonstrating that they [sic] did not inflict the abuse[.]" *Id.*

Here, crediting On-Call Pediatrician's testimony, the ALJ found that rib fractures in infants are "highly suspicious for child abuse." ALJ Opinion (5/26/2016) at 3, Finding of Fact No. 15. On-Call Pediatrician admitted, however, that a rib fracture is a type of injury derived from either an accidental or non-accidental trauma. Radiologist testified that x-ray images of two rib fractures, without more, cannot establish abuse. On-Call Pediatrician also conceded that an older sibling jumping onto an infant could cause rib fractures "[i]f there is an anterior/posterior [front and back] compression." N.T. 103-04. Both physicians testified that reading an x-ray image, by itself, cannot support a conclusion that abuse occurred. The ALJ credited the above testimony; in fact, he credited the testimony of all witnesses except Parents. ALJ Opinion (5/26/2016) at 13.

22

The evidence, taken as a whole, did not establish that the alleged abuse is "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent." 23 Pa. C.S. §6381(d). An injury that is "highly suspicious for child abuse" does not establish abuse. CYS did not establish, by substantial evidence, the occurrence of "child abuse," which is defined as "*intentionally, knowingly or recklessly … [c]ausing bodily injury to a child through any recent act or failure to act….*" 23 Pa. C.S. §6303(b.1)(1) (emphasis added). Section 6303(c) further states that "[c]onduct that causes injury or harm to a child … shall not be considered child abuse *if there is no evidence that the person acted intentionally, knowingly or recklessly* when causing the injury or harm to the child…." 23 Pa. C.S. §6303(c) (emphasis added). Stated otherwise, the mere existence of an injury, without additional evidence, cannot support a finding of abuse. Here, CYS offered no evidence of Parents' culpability. For all of the foregoing reasons, we conclude that CYS failed to establish, with substantial evidence, a *prima facie* case of abuse under Section 6381(d) of the Law, 23 Pa. C.S. §6381(d). The Bureau, therefore, erred by shifting the burden of proof to Parents to rebut a claim that they abused their child.

## Conclusion

For all of the foregoing reasons, we reverse the Bureau's decision and direct the expunction of Parents' indicated report from the ChildLine Registry and deny Parents' request for oral argument as moot.

_____
MARY HANNAH LEAVITT, President Judge

23

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

T.K. and M.K.,                          :
              Petitioners      :
                                   :      **CASE SEALED**
           v.                       :      No. 1029 C.D. 2016
                                   :
Department of Human Services,           :
              Respondent       :

# **O R D E R**

AND NOW, this 8th day of May, 2017, the order of the Department of Human Services, Bureau of Hearings and Appeals, dated June 2, 2016, in the above-captioned matter is hereby REVERSED and T.K. and M.K.'s indicated report is ORDERED to be removed from the ChildLine Registry. Petitioners' application for oral argument is DENIED.

                                 _____

                                 MARY HANNAH LEAVITT, President Judge