IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J.H.,                                     :
                    Petitioner            :
                                          :    **SEALED CASE**
          v.                              :    No. 517 C.D. 2017
                                          :    Submitted: September 29, 2017
Department of Human Services,             :
                    Respondent            :


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE DAN PELLEGRINI, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY PRESIDENT JUDGE LEAVITT                           FILED: January 17, 2018

          J.H. (Foster Father) petitions for review of an adjudication of the
Department of Human Services, Bureau of Hearings and Appeals (Bureau) that
denied Foster Father's request to expunge an indicated report of abuse of his foster
son, Z.B.-R (Child), from the ChildLine Registry.[1]  In doing so, the Bureau adopted
the recommendation of the Administrative Law Judge (ALJ) who conducted the
evidentiary hearing.  Foster Father argues that the Bureau erred because the
Department's Office of Children and Youth and Families (Department) did not offer
substantial evidence of child abuse.  We agree and reverse.


                              **Background**

---

[1] ChildLine, a unit within the Department, operates a statewide system for receiving reports of
suspected child abuse; refers the reports for investigation; and maintains the reports for reference.
55 Pa. Code §3490.4.

Foster Father and K.H (Foster Mother) (collectively, Foster Parents) are married and have been appointed by their county Children and Youth Services agency (CYS) to serve as foster parents. Child, who was born 11 weeks prematurely in October 2014, was placed into the care of Foster Parents three weeks later. On the evening of December 28, 2014, Foster Mother brought Child to the hospital emergency room because he was having difficulty breathing and running a fever. Certified Record (C.R.) Item No. 3, Exhibit C-5, at 2. A chest x-ray revealed left posterior fractures on ribs 8, 9, and 10; a subsequent x-ray identified the fractures as two to three weeks old. Child also underwent an ophthalmological examination; the examination ruled out Shaken Baby Syndrome. Child's bloodwork did not reveal a medical cause for the fractures. *Id.* The hospital notified the Department that Child's injuries were concerning for nonaccidental trauma, and Child was placed with a new foster family.

After receiving the hospital's report, the Department assigned a caseworker (Caseworker) to investigate jointly with law enforcement. On February 26, 2015, the Department filed an indicated report with the ChildLine Registry listing Foster Parents as perpetrators of child abuse. C.R. Item No. 3, Exhibit C-1. The report stated:

> The victim child received posterior rib fractures to the left side, 8, 9 and 10 ribs. The child was in the care of [Foster Parents] during the period of time that the injuries occurred. Medical evidence determined the injuries to be caused by an abusive or aggressive act to the child. Therefore, this case is indicated. A criminal investigation is pending.

C.R. Item No. 3, Exhibit C-1, at 2. On April 27, 2015, Foster Parents learned that they had been listed as perpetrators of physical abuse of Child on the ChildLine Registry. Foster Parents appealed, and a hearing was held before an ALJ.

2

The Department offered Child's medical records and the testimony of a pediatrician (Pediatrician), who is board-certified. On December 28, 2014, she and a team of doctors reviewed Child's fractures. Pediatrician and the radiologist who did the x-rays determined that because of the callus formations on Child's 8th, 9th, and 10th ribs, the fractures occurred approximately two to three weeks earlier. They concluded that Child sustained the rib fractures sometime between December 7, 2014, and December 15, 2014.

Pediatrician also reviewed Child's medical history and records. They showed that Child was brought to the emergency room on December 5, 2014, where he was diagnosed with a viral respiratory infection. Chest x-rays done at that time did not show any rib fractures. Child returned to the emergency room by ambulance on December 8, 2014, for an infection and was discharged later that day. Finally, he returned on December 28, 2014, when the rib fractures were discovered.

Pediatrician ordered tests to rule out disease or Child's premature birth as a cause of Child's rib fractures. She explained:

> [Pediatrician]: I reviewed his records for risk factors in the [Newborn Intensive Care Unit (NICU)] that would lead to a condition called osteopenia in prematurity, which is a condition that premature babies may have. There are certain criteria that babies have weak bones because of their --- just their prematurity. So the NICU doctors are extremely well aware of that. They monitor it very closely, *and he had no risk factors for osteopenia prematurity*. So I reviewed all of that, looking for a reason other than abuse for him to have these fractures.

Notes of Testimony (N.T.), 2/1/2016, at 39-40 (emphasis added); Reproduced Record 42a-43a (R.R. ___). Pediatrician concluded that neither a bone disease nor complications from Child's premature birth caused the posterior rib fractures.

3

Pediatrician testified that posterior rib fractures in infants are caused by bending rather than a "direct blunt-force mechanism." N.T. 38; R.R. 41a. She explained that pediatric literature tells that "posterior rib fractures have a very high specificity for being caused by child abuse… [a]nd [Child] had three posterior rib fractures." N.T. 38-39; R.R. 41a-42a. Pediatrician stated that it takes a lot of force to break an infant's ribs, and the fracture would cause a great deal of pain.

Pediatrician testified that she spoke to Foster Parents on the evening of December 28, 2014, about the injury, but they could not recall an incident that could have caused Child's fractures. They asked Pediatrician whether the fractures could have been caused by physical therapy exercises they regularly did with Child, which involved "moving his arms and legs and twisting him from side to side." N.T. 53; R.R. 56a. Foster Parents demonstrated the movements, and Pediatrician opined that the exercises would not have caused Child's fractures. *Id.*

Foster Parents later suggested three other possible mechanisms for the rib fractures to Caseworker. Foster Mother recalled holding Child around his chest as she ascended a staircase, tripped, and fell with Child against the wall. Second, Foster Parents wondered if Child could have sustained the fractures during his ride in an ambulance to the hospital on December 8, 2014.[2] Third, Foster Mother recalled dozing off once while holding Child in bed and wondered if she could have accidentally rolled over on him. Caseworker relayed the proposed mechanisms to Pediatrician, and she opined that none would have caused Child's rib fractures.

---

[2] Child was taken to the hospital by ambulance the evening of December 8, 2014, because of difficulty breathing.

Pediatrician conceded that she could not determine the cause of Child's rib fractures within a reasonable degree of medical certainty. More specifically, she testified:

> [Counsel]: And you cannot, within the same degree of medical certainty, say that [Foster Father] caused this injury; can you?
>
> [Pediatrician]: I cannot.
>
> [Counsel]: As a matter of fact, within any degree of medical certainty, you cannot tell us who did this to this child; can you?
>
> [Pediatrician]: That's correct.

N.T. 76; R.R. 79a.

Caseworker testified about his investigation. The initial report he received read as follows:

> Child was seen at [   ] Medical Center on 12/05/14 due to respiratory [i]ssues. A chest x-ray was done on that date and the child had no injuries. Child seen at [   ] Medical Center on 12/29/14 with concerns of a fever. A chest x-ray was done on this date which showed child had left posterior fractures of ribs 8, 9, and 10 with callous formation present. The fractures are healing and appear to be 2-3 weeks old. The foster parents were interviewed and could give no explanation for the injuries. The foster mother's mother and the foster father's mother were the only other caregivers for short periods of time. The injuries appear to be non-accidental in nature.

C.R. Item No. 3, Exhibit C-1 at 1-2. Caseworker contacted law enforcement and the CYS agency that appointed Foster Parents. He and law enforcement individuals interviewed Foster Parents, both together and separately, about the report.

During the first individual interview with Foster Mother, she advised Caseworker of three possible scenarios for Child's injury, *i.e.*, the stair-tripping incident, the ambulance ride, and dozing off while holding Child.

5

Caseworker also met individually with Foster Father. Based on that interview, Caseworker learned that Foster Father works long hours as a roofer. Nevertheless, he took care of Child at night and on weekends. Foster Father could not provide "any explanation on what could've caused these injuries." N.T. 123; R.R. 126a. Foster Father never saw his wife get agitated with Child. Likewise, Foster Mother never saw her husband act inappropriately with Child.

In his interview of both Foster Parents, Caseworker learned that between December 6 and December 15, Child had been left with Foster Mother's parents on two occasions. Both the police and Caseworker interviewed Foster Mother's parents, and they could not explain the cause of Child's rib fractures.

Caseworker testified that based on the totality of the investigation, he concluded that Foster Mother and Foster Father physically abused Child. He acknowledged that no criminal charges have been brought against Foster Parents.

Foster Parents testified next. Foster Mother stated that shortly after being placed in their care, Child began to develop respiratory problems. Foster Mother took Child to his primary care physician at least twice and called him regularly. Foster Mother explained that on December 5, 2014, Child was admitted to the hospital because of his respiratory difficulties and was kept overnight. Neither Foster Mother nor Foster Father stayed with him at the hospital.

Foster Mother testified that Child was seen weekly by a visiting nurse, who would check Child thoroughly:

> [Counsel]: During this window that I've been calling it between the 5th and the 15th, did the nurse make appointments during that time period?
>
> [Foster Mother]: Yes, she did.
>
> [Counsel]: About how many would that add up to?

6

[Foster Mother]:  About twice.

[Counsel]:  Did she ever express any concern to you that [Child] may be injured?

[Foster Mother]: No.

N.T. 169; R.R. 172a.

Foster Mother testified that on one occasion she left Child in the care of her parents for approximately two hours while she and Foster Father attended a Christmas banquet.  Finally, Foster Mother explained that aside from the three possibilities she discussed with Caseworker, she had no explanation for Child's rib fractures.  She denied causing them.

Foster Father testified briefly.  He confirmed the entirety of Foster Mother's testimony and denied causing Child's rib fractures.

On April 4, 2016, the ALJ issued a recommendation that the appeal of Foster Father be denied and the appeal of Foster Mother be sustained.  On April 12, 2016, the Bureau adopted the ALJ's recommendation in its entirety.  Foster Father petitioned for reconsideration, which the Secretary of Human Services granted on May 12, 2016.  On March 29, 2017, the Secretary entered a final order upholding the ALJ's initial report in its entirety.  Foster Father petitioned for this Court's review.

**Appeal**

7

On appeal,[3] Foster Father argues that the Department failed to offer substantial evidence that Child suffered physical abuse. As such, the ALJ erred in applying the statutory presumption of abuse under Section 6381(d) of the Law to Foster Father. Alternatively, Foster Father argues that his evidence successfully rebutted the presumption.

**Analysis**

We begin with a review of the relevant provisions of the Child Protective Services Law (Law).[4] The Department will issue an indicated report where substantial evidence of the alleged abuse by a perpetrator exists based on available medical evidence, the child protective service investigation, or an admission of the facts of abuse by the perpetrator. 23 Pa. C.S. §6303(a); *G.V. v. Department of Public Welfare*, 91 A.3d 667, 671 (Pa. 2014). Section 6303(a) of the Law defines "substantial evidence" as "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." 23 Pa. C.S. §6303(a). Substantial evidence must satisfy the preponderance of the evidence standard. *T.H.*, 145 A.3d at 1198.

At the time of the alleged abuse of Child in this case, Section 6303(b) of the Law defined the term "child abuse" as follows:

(1) The term "child abuse" shall mean any of the following:

---

[3] "This Court's review is limited to determining whether legal error has been committed, whether constitutional rights have been violated, or whether the necessary findings of fact are supported by substantial evidence." *T.H. v. Department of Human Services*, 145 A.3d 1191, 1196 n.6 (Pa. Cmwlth. 2016) (quoting *F.R. v. Department of Public Welfare*, 4 A.3d 779, 782 n.7 (Pa. Cmwlth. 2010)).

[4] 23 Pa. C.S. §§6301-6386.

8

(i)   Any recent act or failure to act by a perpetrator which causes nonaccidental serious physical injury to a child under 18 years of age.

23 Pa. C.S. §6303(b)(1)(i) (repealed by the Act of December 18, 2013, P.L. 1170, effective December 31, 2014).[5]  "Nonaccidental" was defined as "[a]n injury that is the result of an intentional act that is committed with disregard of a substantial and unjustifiable risk." 23 Pa. C.S. §6303(a) (repealed by the Act of December 18, 2013, P.L. 1170, effective December 31, 2014).  "Serious physical injury" was further defined as:

An injury that:

(1)   causes a child severe pain; or

(2)   significantly impairs a child's physical functioning, either temporarily or permanently.

*Id.*  The government agency that files the indicated report has the burden to show that the report is accurate and being maintained in a manner consistent with the Law. *T.H.*, 145 A.3d at 1198.

Section 6381(d) of the Law establishes a presumption for identifying the perpetrator of abuse.  It states:

(d)  Prima facie evidence of abuse.--Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist *except by reason of the acts or omissions of the*

---

[5] The ALJ used this definition of child abuse in the adjudication because "this matter [is] based on the alleged abuse occurring in December 2014." ALJ Recommended Adjudication at 5; R.R. 192a. This version of Section 6303 was repealed effective December 31, 2014, and replaced with the current version. Although CYS did not file the indicated report until February 29, 2015, the Department does not appeal the ALJ's use of the prior definition of child abuse under Section 6303. *See T.K. v. Department of Human Services*, (Pa. Cmwlth., No. 1029 C.D. 2016, filed May 8, 2017), slip. op. at 21 n.9 (holding the time the indicated report was filed is determinative of what version of Section 6303 applies).  Accordingly, we apply the prior definition of child abuse.

9

*parent or other person responsible for the welfare of the child* shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa. C.S. §6381(d) (emphasis added).  Our Supreme Court has explained that the presumption applies where a child has "suffered injury that would not ordinarily be sustained but for the acts or omissions of the parent or responsible person." *In re L.Z.*, 111 A.3d 1164, 1185 (Pa. 2015).  The *prima facie* evidence provision is the vehicle for establishing that the person "responsible for the welfare of the child" is the one who perpetrated the abuse. *Id.*  This presumption can be rebutted.

Foster Father argues, first, that the ALJ erred in concluding that the Department proved that Child's rib fractures resulted from abuse.  He contends that Pediatrician's testimony was equivocal at best and established only that infant rib fractures are "highly specific" for abuse.  This did not prove that Child suffered physical child abuse.  Accordingly, the ALJ erred in applying the presumption in Section 6381(d) of the Law to shift the burden of proof to him.  The Department responds that even though Pediatrician could not opine on the cause of Child's injuries within a reasonable degree of medical certainty, she ruled out birth abnormalities, disease, and accidental causes.  Thus, Pediatrician's testimony was sufficient to establish abuse.  Accordingly, the presumption was properly applied to Foster Father, and he failed to rebut it.

## Substantial Evidence of Child Abuse

The ALJ found that fractures to an infant's posterior ribs are caused by squeezing the infant's rib cage and not by blunt-force trauma.  ALJ Recommended Adjudication at 3; Finding of Fact No. 12.  He also determined that it takes significant force to break the rib of a two to three-month old infant because their ribs are highly elastic, and each rib fracture would have been severely painful to Child.

10

*Id.,* Finding of Fact Nos. 13, 14. Accordingly, the ALJ concluded that there was substantial evidence that Child suffered a "serious physical injury" under former Section 6303(a). There is no dispute that Child's left posterior rib fractures would have caused severe pain and, thus, constitute a serious physical injury.

However, the Department was also required to prove that Child's injury was nonaccidental. Pediatrician testified that Child's rib fractures were not the result of any of Foster Parents' proposed scenarios, nor were the fractures caused by any natural or medical causes. Based on this testimony, the ALJ concluded that Child's rib fractures were nonaccidental and attributable to physical abuse. We disagree with the ALJ's conclusion for several reasons.

First, Pediatrician's testimony is inconsistent with Child's medical records and the pediatric literature proffered by the Department. Pediatrician testified that she reviewed Child's medical records and found "no risk factors for osteopenia," which is common in premature infants.[6] N.T. 39-40; R.R. 42a-43a. However, Child's NICU records reveal that x-ray reports of his abdomen and chest, taken on October 3, 2014, and November 10, 2014, respectively, find that "[o]steopenia is noted." C.R. Item No. 3, Exhibit C-3 at 7, 42. Accordingly, Pediatrician's testimony misstates Child's medical history; Child has suffered from osteopenia since birth.

Osteopenia of prematurity is significant in this case, as explained by the medical literature appended to the Department's own brief. The appended Clinical Report published by the American Academy of Pediatrics titled "Evaluating Children with Fractures of Child Physical Abuse," states that "osteopenia of

---

[6] Osteopenia is defined as "[d]ecreased calcification or density of a bone; a descriptive term applicable to all skeletal systems in which such a condition is noted[.]" STEDMAN'S MEDICAL DICTIONARY 1284 (27th ed. 2000).

prematurity may make the infant more vulnerable to fracture[.]" Department Brief, Appendix at 4. The Report further explains that osteopenia commonly presents between the sixth and twelfth weeks of an infant's life, and "[f]ractures associated with osteopenia of prematurity usually occur in the first year of life. *Rib fractures are typically encountered incidentally*, whereas long bone fractures commonly present with swelling of the extremity." *Id.* (emphasis added). Simply, Pediatrician's opinion that Child's fractures did not result from complications of premature birth, *i.e.*, osteopenia, was unfounded and incompetent.

Second, we agree with Foster Father that Pediatrician's testimony did not establish that Child suffered "child abuse," which as noted above, requires a "nonaccidental serious physical injury." 23 Pa. C.S. §6303(b)(1)(i) (repealed). Foster Father argues that this Court's recent opinion in *T.K. v. Department of Human Services*, (Pa. Cmwlth., No. 1029 C.D. 2016, filed May 8, 2017), where we determined a pediatrician's testimony was insufficient to establish substantial evidence of child abuse, is analogous to the matter *sub judice*.[7] In *T.K.*, we set aside an indicated report of abuse on procedural grounds. However, we also considered whether CYS had established that the infant child had suffered abuse.

In *T.K.*, abuse was suspected where a four-month-old infant had suffered anterior lateral fractures of the sixth and seventh ribs. The injury was reported to CYS as "highly suspicious" for nonaccidental trauma, and on that basis the parents were named as perpetrators of abuse. The parents appealed.

At the hearing, CYS presented the testimony of the on-call pediatrician who x-rayed the child's ribs and concluded that the fractures were "highly

---

[7] Pursuant to Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code §69.414(a), an unreported opinion filed after January 15, 2008, may be cited for its persuasive value and not as binding precedent.

12

suspicious" and not likely to have been caused by the accidents described by parents. The pediatrician also ruled out disease and other medical conditions as causes. The pediatrician conceded that rib fractures in infants could result from either accidental or nonaccidental trauma.

The parents presented the testimony of a radiologist and their family pediatrician. Noting that the x-rays were the only physical evidence of abuse, the radiologist testified that x-rays alone cannot establish how an injury was sustained. The child's treating pediatrician testified that he saw both the child and his brother on a regular basis. The child had been healthy at all their visits. He acknowledged that rib fractures are concerning for nonaccidental trauma, but that he had no specific concerns that the parents had abused their child. The ALJ concluded that because the injuries would have caused the child to experience severe pain, the child was the victim of physical abuse. This Court reversed, holding that an injury that is "highly suspicious for child abuse" does not establish that "child abuse" occurred as that term is defined in the Law. In short, "the mere existence of an injury, without additional evidence, cannot support a finding of abuse." *T.K.*, slip. op. at 23.

Foster Father argues that, as in *T.K.*, Pediatrician's testimony established that Child suffered an injury, but her testimony was "very unclear concerning the question of whether the injuries sustained by [Child] were in fact evidence of child abuse." Petitioner Brief at 10. Pediatrician testified that fractured ribs in infants are "highly concerning for abuse" and "most likely to be abuse," but she relied on pediatric literature in making those conclusions and not upon any facts about Child's care. N.T. 79; R.R. 82a. *T.K.* made clear that an injury that suggests abuse will not support a finding of abuse.

13

We agree with Foster Father. *T.K.* was decided under the current definition of "child abuse" in Section 6303(b.1)(1) of the Law; however, the prior definition applicable in this case is similar. *Compare* 23 Pa. C.S. §6303(b.1)(1) *with* 23 Pa. C.S. §6303(b)(1)(i) (repealed). The current definition of child abuse requires a showing that an individual "intentionally, knowingly or recklessly" caused bodily injury to a child through any recent act or failure to act. 23 Pa. C.S. §6303(b.1). The former definition is "[a]ny recent act or failure to act by a perpetrator which causes nonaccidental serious physical injury to a child under 18 years of age." 23 Pa. C.S. §6303(b)(1)(i) (repealed). "Nonaccidental" is further defined as "[a]n injury that is the result of an *intentional act* that is committed with disregard of a substantial and unjustifiable risk." 23 Pa. C.S. §6303(a) (repealed) (emphasis added). Both definitions require a showing of intent.

In *T.K.*, "CYS offered no evidence of parent's culpability" and we are presented with the same scenario here. The Department did not present any evidence that Child's injury was the result of an intentional act by Foster Father. Instead, the ALJ inferred that Child's injuries must have been nonaccidental because Pediatrician ruled out the three proposed mechanisms suggested by Foster Parents. But Pediatrician's testimony was not competent, at least with respect to Child's osteopenia. Simply, there is no substantial evidence of an intentional act of abuse. Further, Child's injury could have occurred at any point during a ten-day period, during which time Child was in the care of a variety of persons responsible for his welfare, including Foster Parents, hospital personnel, EMT personnel and babysitters.

In sum, the Department proved that Child sustained rib fractures, but did not offer evidence that those fractures were caused by an intentional act of Foster

14

Father or any other person "responsible for the welfare of the child." 23 Pa. C.S. §6381(d). Under the principles of *T.K.*, "the mere existence of an injury, without additional evidence, cannot support a finding of abuse." *T.K.*, slip. op. at 23.

We hold that the Department failed to establish that Child suffered abuse under the relevant definition in Section 6303(b)(1)(i) (repealed). Accordingly, the ALJ erred in applying the statutory presumption of abuse under Section 6381(d) of the Law to Foster Father.

## Conclusion

For the foregoing reasons, we reverse the Bureau's adjudication and direct the expunction of Foster Father's indicated report from the ChildLine Registry.

_____
MARY HANNAH LEAVITT, President Judge

15

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J.H.,                                            :
              Petitioner             :
                        :   **SEALED CASE**
       v.                                       :   No. 517 C.D. 2017
                        :
Department of Human Services,                    :
              Respondent           :

## **O R D E R**

AND NOW, this 17th day of January, 2018, the order of Pennsylvania Department of Human Services, Bureau of Hearings and Appeals dated March 29, 2017, in the above-captioned matter is REVERSED and J.H.'s indicated report is ORDERED to be removed from the ChildLine Registry.

_____
MARY HANNAH LEAVITT, President Judge