**F.R., Petitioner**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 24, 2010.

Decided Sept. 1, 2010.

Michael D. Recchiuti, Allentown, for petitioner.

Lisa Dees, Asst. Counsel, Harrisburg, for respondent.

BEFORE: PELLEGRINI, Judge, and BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge BROBSON.

F.R. (Petitioner) petitions for review of an order of the Department of Public Welfare (Department), dated December 2, 2009, upholding the decision of the Department's Bureau of Hearings and Appeals (Bureau) that denied expungement of an indicated report of child abuse against Petitioner and denied removal of his name from the Childline Registry.[1] Petitioner argues that substantial evidence did not exist to support a finding that Petitioner caused the injuries sustained by his 10 year old son, P.R., and that the record does not support a finding that P.R. suffered severe pain. Petitioner also argues that the Bureau erred in applying only the Child Protective Services Law (CPSL)[2] instead of Section 509 of the Crimes Code,

18 Pa.C.S. § 509 (Crimes Code). For the reasons set forth below, we affirm.

The facts, as found by the Bureau and adopted by the Department, are substantially as follows.[3] On August 1, 2007, Petitioner, the biological father of P.R., told P.R. to complete a reading assignment while Petitioner was out.[4] (Reproduced Record (R.R.) at 34a). Petitioner told P.R. if he failed to complete the assignment by the time Petitioner got home, P.R. would receive a "really hard" spanking. (Id.) When Petitioner returned home, P.R. lied about the assignment, stating he could not find the assignment. (Id.) Petitioner searched P.R.'s room for the assignment, while P.R.'s stepmother found the assignment in the downstairs garbage where P.R. had thrown it out. (Id.) Petitioner then took P.R. downstairs and spanked him with an open hand with P.R. wearing just his underpants. (Id. at 35a.)

About one week later, on August 6, 2007, while P.R. was attending an overnight camp in New Jersey, P.R. told several people that his dad had hit him and that it had left marks. (Id.) An oral report of physical child abuse was reported to the New Jersey Division of Family Services that same day. (Id.) On August 7, 2007, Krista DeBroux (DeBroux), a supervisor for the New Jersey Division of Youth and Family Services, conducted an investigation into P.R.'s accusations, interviewing P.R. on that day. (Id.) P.R. told DeBroux that he had bruising on his buttocks from

---

1. The Childline Registry is a unit of the Department that operates a statewide toll-free system for receiving and maintaining reports of suspected child abuse, along with making referrals for investigation. 55 Pa.Code § 3490.4.

2. 23 Pa.C.S. §§ 6301–6385.

3. In expungement proceedings, the Bureau is the ultimate fact finder with authority to

make determinations of credibility. *W.S. v. Dep't of Pub. Welfare*, 882 A.2d 541, 542 n. 2 (Pa.Cmwlth.2005).

4. P.R. is a male child born on June 20, 1997, and he was ten (10) years old at the time of the incident. (R.R. at 34a.) At the time of the hearing, P.R. was eleven (11) years old. (*Id.*)

being "whacked" by his father "like a million times" the prior Thursday. (*Id.*) He also told DeBroux that his father spanked him because he threw away his reading assignment. (*Id.*) DeBroux observed the bruises on P.R.'s buttocks and took photos. (*Id.*) DeBroux then submitted the results of her investigation to Northampton County Children and Youth Services (C & Y).[5] (*Id.*)

After C & Y received the child abuse report from DeBroux, Donald K. Vaughn (Vaughn), then a caseworker for C & Y, conducted an investigation into the alleged abuse. (*Id.*) P.R. told Vaughn in an interview that he had been struck thirty-five (35) times by his father for throwing away his reading assignment. (*Id.* at 35a–36a.) P.R. also told Vaughn that on a pain scale of 0–10, with 10 being severe pain, that the pain P.R. had experienced was about a ten (10), and that he had trouble sleeping on his backside for about three (3) days. (*Id.* at 36a.) Vaughn also interviewed Petitioner who, when shown the photographs, was surprised at the severity of the bruising. (*Id.*)

On October 2, 2007, C & Y filed an indicated report of child abuse[6] against Petitioner and placed Petitioner's name on the Childline Registry. Petitioner filed an appeal to the Bureau, which held a hearing before an Administrative Law Judge (ALJ). The ALJ denied Petitioner's request for expungement, and Petitioner appealed to the Department. By order dated December 7, 2009, the Department affirmed the Bureau's decision to deny expungement. Petitioner then filed the subject petition for review with this Court.

■■■ On appeal to this Court,[7] Petitioner argues that the findings of fact that Petitioner caused the bruising suffered by P.R. and that P.R. suffered severe pain are not supported by substantial evidence. Petitioner further argues that the Department applied the wrong standard in determining whether there was child abuse in this case.

As to the factual issues, Petitioner argues that the Department did not meet its burden in showing by substantial evidence that (1) P.R.'s injuries were a result of Petitioner's actions and that (2) P.R. suffered severe pain or temporary physical impairment from the injuries. Petitioner is wrong in both instances.

5. Although the New Jersey Division of Family Services conducted the initial investigation because P.R. was in New Jersey when the incident came to light, jurisdiction belonged to C & Y because the alleged abuse occurred in Northampton County. (R.R. at 35a.)

6. An "indicated report" is defined as:
A child abuse report made pursuant to this chapter if an investigation by the county agency or the Department of Public Welfare determines that substantial evidence of the alleged abuse exists based on any of the following:
(1) Available medical evidence.
(2) The child protective service investigation.
(3) An admission of the acts of abuse by the perpetrator.

Section 6303(a) of the CPSL, 23 Pa.C.S. § 6303(a).

7. This Court's review is limited to determining whether legal error has been committed, whether constitutional rights have been violated, or whether the necessary findings of fact are supported by substantial evidence. *K.J. v. Dep't of Pub. Welfare,* 767 A.2d 609 (Pa.Cmwlth.), *appeal denied,* 567 Pa. 750, 788 A.2d 381 (2001). The Department has the burden of proof in expungement cases and must show by substantial evidence that the indicated report of child abuse is accurate. *S.T. v. Dep't of Pub. Welfare,* 962 A.2d 679, 682 (Pa.Cmwlth.2008), *appeal denied,* 547 Pa. 747, 690 A.2d 1165 (1997).

■ The CPSL defines "substantial evidence" as "evidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." Section 6303(a) of the CPSL. "[I]n determining whether a finding of fact is supported by substantial evidence, the Court must give the party in whose favor the decision was rendered the benefit of all reasonable and logical inferences that may be drawn from the evidence of record; the weight and credibility to be accorded to the evidence is solely within the province of the ... fact finder." *S.T. v. Dep't of Pub. Welfare, Lackawanna Cnty. Office, Children, Youth & Family Servs.*, 681 A.2d 853, 856 (Pa.Cmwlth.1996) (citing *Bedford Cnty. Children & Youth Servs. v. Dep't of Pub. Welfare*, 149 Pa. Cmwlth. 127, 613 A.2d 48, 50 (1992)), *appeal denied*, 547 Pa. 747, 690 A.2d 1165 (1997).

■ In this case, there is ample evidence to support a factual finding that Petitioner caused the bruising on P.R. First, it is not disputed that Petitioner struck P.R. open-handed on the buttocks as a disciplinary measure. Second, the testimony of each witness, including Petitioner himself, supports the ALJ's finding that Petitioner's disciplinary measure caused the bruising.

Petitioner admitted in his testimony that he spanked P.R. on August 2, 2007, making contact several times.[8] (R.R. at 65a.) The number of times that Petitioner struck P.R. is not clear from the testimony. Petitioner testified that he could not recall the number of times he struck P.R. (*Id.*) P.R. gave conflicting testimony at different times. In the initial interview with DeBroux, P.R. said that he had been spanked

what "felt like a million times." (*Id.* at 56a.) But when P.R. testified at the hearing, he said that "[i]t felt like a lot but, technically, it was only about six." (*Id.* at 63a.) During his testimony, P.R. also admitted telling people that he had been struck thirty-five times. (*Id.*) Despite P.R.'s inconsistencies as to the number of strikes, P.R.'s testimony explicitly acknowledged that the spanking by his father caused the bruising. (*Id.*) ("I was telling them about how he had hit me, and that he had left marks." (*Id.*) ) Furthermore, Petitioner testified that he "understand[s] now ... that leaving marks on my child is a form of child abuse. I will not do that again." (*Id.* at 65a.) This is an implicit admission by Petitioner, acknowledging that the spanking he administered caused the bruising on P.R. There is substantial evidence, therefore, to support the ALJ's finding that Petitioner's actions caused the injuries P.R. suffered.

■ There is likewise substantial evidence to support the ALJ's finding that the bruises caused P.R. severe pain. In reviewing the ALJ's finding, this Court gives great deference to the fact finder's reasonable inferences and judgments of credibility. *S.T.*, 681 A.2d at 856. Furthermore, in *D.N. v. Department of Public Welfare*, 127 Pa.Cmwlth. 580, 562 A.2d 433 (1989), this Court held that "regardless of the absence of testimony from either the victim or a medical witness, photographs depicting injuries may provide substantial evidence to support a finding that the child suffered severe pain." *S.T.*, 681 A.2d at 856–57.

In this case, there is photographic and testimonial evidence that substantially supports the ALJ's determination that P.R.

---

8. There is some question as to the precise date on which the spanking occurred. (*See* Pet. Br. at 8 n. 1.) The CY 48 form and Adjudication indicate August 1, 2007, but DeBroux testified that on August 7, 2007, P.R. told her that he had been spanked on the preceding Thursday, which would have been August 2, 2007. (*Id.*)

suffered severe pain. P.R. testified that on a scale of 0–10, with 0 representing no pain and 10 representing the most pain he ever experienced, he experienced a pain level of "[a]bout eight or nine." (R.R. 63a.) This testimony was inconsistent with prior statements that P.R. had made to Vaughn, indicating a pain level of ten (10). The ALJ noted this discrepancy, but found it to be "minimal." (*Id.* at 44a.) Another discrepancy related to the severity of the pain P.R. suffered dealt with whether P.R. was able to sleep on his back for about three (3) days after the incident. Again, P.R. initially told a caseworker that he was unable to sleep on his back. During testimony before the ALJ, however, P.R. indicated that he was not sure whether the pain from the bruising prevented him from sleeping on his back because he "roll[s] around too much at night." (*Id.* at 63a.) The ALJ also noted this discrepancy, but found that P.R. was not credible on this point. The ALJ opined that P.R. was skewing his testimony to minimize the incident in an effort to help Petitioner, his father. (*Id.* at 44a.) The ALJ summarized his findings on the severity of pain in reference to the 0–10 scale testimony given by P.R., the photographic evidence, and the testimony about P.R.'s sleeping troubles. (*Id.*) Ultimately, the ALJ found that P.R. was in severe pain following the administration of disciplinary measures by Petitioner and that his inability to sleep constituted a functional impairment. (*Id.* at 44a–45a.)

During testimony given before the ALJ, P.R. indicated that he was only spanked six (6) times and that on the 0–10 pain scale, he experienced pain of only "eight (8) or nine (9)." (*Id.*) He also testified that Petitioner has not used corporal punishment since the incident. *Id.* Although the ALJ believed that P.R. may have been attempting to minimize the incident when he testified to the pain he suffered, the

change from "10" to "8 or 9" is negligible in this context, as the ALJ noted. The photographic evidence, taken one week after the incident, further provides ample evidence to support the reasonable inference that P.R. was in severe pain following the spanking. The bruising shown in the photographs is still visible and widespread across both hemispheres of P.R.'s buttocks, even one week after the incident. There is substantial evidence, therefore, to support the ALJ's finding that P.R. suffered severe pain.

■ With substantial evidence supporting the factual premises upon which the ALJ made his decision, the next issue this Court must decide is what the proper standard is for determining child abuse in a case where the injury suffered by the child is the result of corporal punishment, and whether the ALJ applied that standard. This Court concludes, based upon the plain language of the definition of "nonaccidental" and the purpose and intent behind the CPSL, that criminal negligence is the proper standard in corporal punishment cases. We further conclude that the ALJ properly applied the criminal negligence standard in this case.

The Department argues that the criminal negligence standard for "nonaccidental," as enumerated by our Supreme Court in *P.R. v. Department of Public Welfare,* 569 Pa. 123, 801 A.2d 478 (2002), is no longer applicable because the General Assembly amended Section 6303 of the CPSL after *P.R.* was decided, adding a definition for "nonaccidental," and thus superseding *P.R.* Petitioner counters that the criminal negligence standard continues to apply in this situation. Petitioner argues further that because the Crimes Code permits corporal punishment absent serious bodily injury and malicious intent on the part of the actor, expungement is required.

Under the CPSL, "child abuse" is defined as "[a]ny recent act or failure to act by a perpetrator which causes nonaccidental serious physical injury to a child under 18 years of age." Section 6303(b) of the CPSL, 23 Pa.C.S. § 6303(b). A "serious physical injury" is defined as an injury that "causes a child severe pain" or "significantly impairs a child's physical functioning, either temporarily or permanently." Section 6303(a) of the CPSL. "Nonaccidental" is defined as "[a]n injury that is the result of an intentional act that is committed with disregard of a substantial and unjustifiable risk." *Id.*

The Crimes Code provides parents and guardians an affirmative defense of justified use of force in *criminal proceedings* for the use of corporal punishment, so long as it is used for the "purpose of safeguarding or promoting the welfare" of the child and "the force used is not designed to cause or known to create a substantial risk of causing death, serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation." Section 509 of the Crimes Code; *see also P.R.*, 569 Pa. at 136, 801 A.2d at 485 (noting that Section 509 of Crimes Code is affirmative defense of justification in criminal proceedings); *Miller on Behalf of Walker v. Walker*, 445 Pa.Super. 537, 665 A.2d 1252, 1256 (1995) (distinguishing Section 509 of Crimes Code from Protection from Abuse Act, 23 Pa. C.S. §§ 6101–6117, on grounds that Crimes Code provides affirmative defense to criminal actions, not administrative actions). The Crimes Code presents a more onerous standard to prove child abuse in the criminal context than the CPSL's standard to prove child abuse in the administrative setting. *Compare* Section 509 of the Crimes Code (defining impermissible corporal punishment in terms of "serious bodily injury") *with* Section 6303(b) of the CPSL (defining child abuse in terms of "serious physical injury"). While there is little doubt that the Crimes Code and the CPSL are linked in some ways, it is clear, as acknowledged by our Supreme Court in *P.R.*, that the Crimes Code standard applies in criminal proceedings, while the CPSL standard applies to administrative proceedings. This does not imply that corporal punishment is barred under the CPSL, but rather that the standard of determining when corporal punishment crosses the threshold into child abuse is different in the criminal and administrative contexts. *See P.R.*, 569 Pa. at 132, 801 A.2d at 483 (citing Section 6302(c) of the CPSL, 23 Pa.C.S. § 6302(c), and recognizing that CPSL "offers no restriction on the existing rights of parents to use corporal punishment.") The appeal now before the Court is from an administrative proceeding under the auspices of the CPSL, and, thus, the Crimes Code does not apply.

With the applicable statute identified, we now turn to our interpretation of the CPSL, and, in particular, the definition of "nonaccidental." In *P.R.*, a case involving corporal punishment, our Supreme Court dealt with interpreting the then-undefined term "nonaccidental" in the CPSL. Our Supreme Court differentiated acts resulting in accidental injuries and acts of child abuse by applying the criminal negligence standard. The Supreme Court held that "in cases where a child suffers a serious injury arising from the administration of corporal punishment, a finding that the injury resulted from abuse versus accident will depend upon a showing, by the agency, through substantial evidence, that the injury resulted from criminal negligence." *Id.* at 138, 801 A.2d at 487. The Supreme Court in *P.R.* adopted the statutory definition of "criminal negligence" as set forth in Section 302(b)(4) of the Crimes Code, 18 Pa.C.S. § 302(b)(4), and applied it to instances of corporal punishment in the context of the CPSL:

A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and intent of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

*Id.* at 137–38, 801 A.2d at 487.

In *P.R.*, a mother swung a belt in an attempt to strike her child on the buttocks as a form of corporal punishment. The child, however, moved to evade the strike, and the buckle of the belt hit and injured the child's eye. The eye injury ultimately required surgery. The Supreme Court considered whether the injury was the result of abuse or an accident, where the mother intended to swing the belt towards the child, but did not intend for the belt buckle to strike the child in, or around, the eye. Our Supreme Court aptly noted:

> The tension in resolving cases where a parent or guardian is accused of child abuse when an act of corporal punishment results in a serious injury must be acknowledged. Undoubtedly, the legislature recognized this dilemma when drafting the definition of child abuse at issue. To balance the competing objectives of protecting children from abuse while maintaining the parental right to use corporal punishment, the legal standard for differentiating abuse from accident must acknowledge some level of culpability by the perpetrator that his actions could reasonably create a serious injury to the child. The standard that best comports with the problem of defining abuse in terms of nonaccidental injury is criminal negligence.

*Id.* at 137, 801 A.2d at 486–87. The Supreme Court, therefore, held that to show child abuse in cases of corporal punishment, the agency must show, through substantial evidence, that the child's serious injury was the result of criminal negligence. *Id.* at 138, 801 A.2d at 487. The Supreme Court ultimately concluded that the use of a belt that bears a buckle in administering corporal punishment, in and of itself,

> cannot be viewed … as a gross deviation from the standard of care a reasonable person would observe in the same situation. Without substantial proof that this unusual injury was more than the regrettable result of corporal punishment, we cannot allow the oddity of the result itself to presuppose the element of unjustifiable risk that would lead to the finding of criminal negligence.

*Id.* at 138, 801 A.2d at 487.

Our Supreme Court did not focus solely on the seriousness of the resulting injury or the foreseeability of that injury, but rather it blended aspects of both in interpreting "nonaccidental" to be the standard of care a reasonable parent would use in administering corporal punishment. The above concerns and considerations of the Supreme Court have not changed since its decision in *P.R.* These concerns and considerations, along with the plain language of the definition of "nonaccidental" and the purpose and intent behind the CPSL, inform and direct our decision in this case.

The Department contends that the amendment of the CPSL to include the definition of "nonaccidental" requires this Court to look *only* at whether there was a resulting "serious physical injury" from the intentional acts of the perpetrator in order to establish child abuse. We disagree.

In contrast to the Department's contention, we believe the General Assembly's amendment of the CPSL following *P.R.* was an effort to codify the Supreme Court's decision in *P.R.*, not circumvent it. The phrase "substantial and unjustifiable risk" found in the CPSL's definition of "nonaccidental," added after *P.R.*, is found verbatim in the definition of criminal negligence. *Compare* Section 509 of the Crimes Code (*"substantial and unjustifiable risk* that the material element exists or will result from his conduct") (emphasis added) *with* Section 6303 of the CPSL ("nonaccidental" defined as "an injury that is the result of an intentional act that is committed with disregard of a *substantial and unjustifiable risk* ") (emphasis added). Furthermore, it would be a curious result for the General Assembly, intending to change the law from the holding in *P.R.*, to use, verbatim, the language employed in *P.R.* Thus, the criminal negligence standard proffered by our Supreme Court in *P.R.* is now codified in the CPSL under the auspices of the definition of "nonaccidental." The result is that *P.R.* remains controlling precedent, and criminal negligence is still the proper standard in corporal punishment cases.

■ Another shortcoming of the Department's interpretation is that it improperly bifurcates the definition of "nonaccidental," giving effect only to the first half of the definition—"an injury that is the result of an intentional act." Section 6303(a) of the CPSL. The second half of the definition, and the part most relevant in the corporal punishment context, is "committed with disregard of a substantial and unjustifiable risk." *Id.* Any act of corporal punishment is necessarily an intentional act, so the first half of the definition, upon which the Department focuses, will always be fulfilled in corporal punishment cases. *See P.R.*, 569 Pa. at 137, 801

A.2d at 486 ("Any definition of child abuse that arises by defining that term in contrast to accident must incorporate the reality that corporal punishment is undertaken with intent. Corporal punishment at its core embodies intent to inflict pain."). Thus, to establish child abuse under the CPSL, the Department must show that there was a "serious physical injury" resulting from "an intentional act committed with disregard of a substantial and unjustifiable risk" of such injury.

This analysis does not discount the idea that permissible acts of corporal punishment can cross the line into the impermissible. The Crimes Code specifically addresses this in the criminal context in limiting the force used to that which is "not designed to cause or known to create a substantial risk of causing death, serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation." Section 509(1)(ii) of the Crimes Code. But, the limit placed on corporal punishment in an administrative setting is defined by the CPSL as "severe physical injury." Section 6303(b)(1)(i) of the CPSL. These two statutes, therefore, act in tandem to create a very limited safe harbor in which parents may use corporal punishment without being found to have engaged in child abuse—one couched in the criminal world; one couched in the administrative world. Thus, an indicated report of child abuse under the CPSL may be proper in a situation in which criminal charges are not. This is what the Supreme Court recognized in *P.R.*, it is what was found to be the purpose and legislative intent behind the statutes, and it is why the Supreme Court used the criminal negligence standard in applying the CPSL to corporal punishment cases. In this way, these considerations work hand-in-hand and create a workable statutory scheme that upholds the General Assembly's intent to protect children and to

provide parents choices in raising and reasonably disciplining their children.

 After determining the proper standard to use in corporal punishment cases, the final step is to determine whether the Department used and properly applied this standard to the case at hand. Upon review of the ALJ's findings and conclusions, we must conclude that the ALJ properly applied the criminal negligence standard. The ALJ specifically found that Petitioner's intentional act of spanking caused P.R. to suffer severe pain and a functional impairment based on the bruising P.R. suffered. (R.R. at 44a.) The ALJ also found that, while F.R. did not act with malicious intent in disciplining P.R., Petitioner "lost control of his emotions" and caused injuries "while disregarding a substantial and unjustifiable risk to P.R." (*Id.*) Thus, the ALJ properly applied the criminal negligence standard in this case when he considered the existence of severe pain and functional impairment, which he found were caused by a substantial and unjustifiable risk.

Accordingly, we affirm the order of the Department.[9]

### ORDER

AND NOW, this 1st day of September, 2010, the order of the Department of Public Welfare is hereby AFFIRMED.

---

9. The parties in this case filed supplemental briefs addressing the applicability of *S.T. S.T.* is not directly applicable in our interpretation of "nonaccidental" in this case because the alleged incident of child abuse occurred on May 17, 2006. The statutory definition of "nonaccidental" did not take effect until May 8, 2007. *See* Section 6303(a) of the CPSL, *as amended* by the Act of Nov. 9, 2006, P.L. 1385.