# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Allegheny County Office of      :
Children, Youth and Families,    :
          Petitioner        :
                          :   No. 211 C.D. 2018
          v.              :
                          :   Submitted: October 16, 2018
Department of Human Services,  :
          Respondent     :

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION BY
JUDGE McCULLOUGH                       FILED: January 4, 2019

      Allegheny County Office of Children, Youth and Families (CYF) petitions for review of the January 23, 2018 final order of the Department of Human Services (Department), Bureau of Hearings and Appeals (BHA), which adopted the recommendation of an administrative law judge (ALJ) sustaining G.C.'s (Father) appeal to expunge an indicated report of child abuse.

## Facts and Procedural History

      The facts, as found by the ALJ and adopted by the BHA are, substantially, as follows. Father is the parent of Z.C. (Child), a child born in July of 2011. (Finding of Fact (F.F.) Nos. 1-2.) Although Father and Child's mother share custody of her, Child was in the custody of Father during the relevant time period from January 6 to January 10, 2017. (F.F. Nos. 3-4.)

On January 10, 2017, Child "got in trouble at school," and Child's paternal grandmother (Grandmother), picked Child up from school early and took her back to Grandmother's house. (F.F. Nos. 6-8.) Father later came to pick Child up from her Grandmother's house and the ALJ found the following facts:

> 12. When [Father] first saw [] [C]hild at [Grandmother]'s house, he began to smack her in the face. ([Notes of Testimony] [(]N.T.[)] 55-60)
> 13. [Father] hit [] [C]hild on the thigh with his hand. (N.T. 59, 63)
> 14. [Father] drove [] [C]hild home and pinched her leg in the car. (N.T. 56)
> 15. When [Father] and [] [C]hild got home, he "started beating [her] and smacked her on the butt." (N.T. 58)
> 16. [C]hild's injuries hurt "a lot," [sic] her face hurt more than her leg and her leg pain "was just bad". [sic] (N.T. 63-64)

(F.F. Nos. 12-16.)

On January 11, 2017, CYF received two separate reports alleging child abuse stemming from the injuries Child sustained on January 10, 2017, and naming Father as the perpetrator. (F.F. No. 17.) One report listed the category of abuse/neglect as "causing bodily injury to [C]hild through recent act/failure to act," and the subcategory as "slapping/striking," indicating that a "[p]hysician stated the [C]hild had a bruise to her right upper thigh and bruising and abrasions to the left side of her face." (F.F. No. 18.) The other report listed the same category of abuse/neglect and included the same physician's statement but, under the subcategory, listed "scratching" and "hitting/punching." (F.F. No. 19.)

A caseworker for CYF was assigned to investigate and, on January 11, 2017, she interviewed Child, Child's mother and maternal grandparents, as well as Father. (F.F. Nos. 20-22, 30.) During Child's interview, she disclosed the facts outlined above regarding the events of January 10, 2017. (F.F. Nos. 22-26.) During

2

Father's interview, he admitted "that he beat [] [C]hild but denied hitting her in the face." (F.F. No 31.) The caseworker also took photographs of Child, two of which were entered into the record: One depicts the left side of Child's face, which has two long scratches and red to dark red marks, and the other depicts Child's right thigh, which has a long light-colored scratch. (F.F. No. 28.)

Dr. Catherine Udekwu, a practicing pediatrician for 23 years and Child's physician since her birth, saw Child for an acute examination on January 11, 2017, during which Child disclosed that Father was upset because Child was in trouble at school and hit her with his hand and punched her right upper thigh. Dr. Udekwu noted Child was alert and engaging and, while her "face was not tender," she had two linear abrasions on her left cheek approximately five centimeters long with redness around them and bruising on her upper thigh that was tender to the touch. (F.F. No. 36.) Dr. Udekwu opined that the injuries were fresh and that, at the time she received them, they caused Child substantial pain. Her assessment was the Child sustained nonaccidental trauma but, regarding follow-up care, only recommended x-rays to rule out further injury. (F.F. Nos. 32-44.)

Lyndsey Craft, a forensic interviewer, interviewed Child and created a report, which stated, in part, the following:

> [Child] reported being hit by her father multiple times in the face as well as in her leg after she had to leave school early due to her behavior. [Child] stated when they got back to her father's house[,] he hit her there as well and sent her down to the basement for punishment. In regards to the hitting at her grandmother's house, [Child] stated her grandmother was present during this contact. [Child] said that when her grandmother picked her up from school, she hit her as well . . . [.]

(F.F. No. 46-48.)

A police report completed by Officer Juan Terry was entered into the record without objection and stated, in part, the following:

> Officer Terry observed the marks on the side of the [Child's] face. The marks were still visible. . . . The [C]hild then told [Officer Terry] what happened, and said she was bad at school and the teacher called her dad and when she got to her dad['s] house she stated "he beat me and scratch my face, [sic] and punch[ed] my leg real hard."

(F.F. Nos. 49-52.) At a hearing, the parties stipulated that a criminal complaint was filed as a result of the incident but charges were later withdrawn after Father fulfilled "a parenting-related condition." (F.F. No. 53.)

In February 2017, CYF filed two indicated reports of child abuse naming Father as a perpetrator, which corresponded to the reports of abuse received on January 11, 2017, and thus differed only with regard to what was listed in the subcategories of abuse: one report listed slapping/striking and the other listed scratching and hitting/punching. (F.F. No. 58; Reproduced Record (R.R.) at 1a-4a.) On May 9, 2017, the Department issued two letters, one specific to each indicated report, notifying Father that he was listed on the ChildLine & Abuse Registry (ChildLine)[1] as a perpetrator in an indicated report of child abuse. (F.F. No. 59.)

---

[1] Section 6331(3) of the Pennsylvania Child Protective Services Law (Law) states, in pertinent part:

> There shall be established in the department a Statewide database of protective services, which shall include the following, as provided by section 6336 (relating to information in Statewide database):
>
> . . .
>
> (3) Indicated and founded reports of child abuse.

23 Pa.C.S. §6331(3).

Father appealed both decisions,[2] and the BHA issued an order consolidating the matters and scheduling an administrative hearing for November 14, 2017. (ALJ's Adjudication at 1.)

Dr. Udekwu testified at the hearing as an expert in pediatric medicine and the ALJ found her credible. She testified in accordance with the facts outlined above regarding the appearance of Child's injuries during her examination on January 11, 2017, and her opinion that the injuries were fresh, caused substantial pain to Child when inflicted, and were caused by nonaccidental trauma. (F.F. No. 61; ALJ's Adjudication at 14.)

Child, who was six years old at the time of the hearing,[3] testified that Father hit her at Grandmother's house, pinched her in the car, and hit her at home. Child also stated that she was smacked in the face and hit in the leg and that, while her injuries hurt "a lot," the injury to her face hurt more than the injury to her leg, which she stated "was just bad," as opposed to hurting "[t]erribly." (R.R. at 67a-68a.) The ALJ determined that Child was competent and her "testimony that [Father] smacked her in the face and punched her in the thigh was consistent with her prior disclosures and credible." (F.F. No. 62.) Additionally, the ALJ noted that Child gave a negative response when questioned as to whether anyone else hit her on the day in

---

[2] Father originally filed two unsigned appeals and, despite the BHA's issuance of two rule to show cause orders directing him to resubmit signed appeals within 10 calendar days in order for his appeals to be considered valid, Father did not do so. As a result, the BHA issued orders dismissing Father's appeals. Father then filed an application for reconsideration with regard to both appeals and, on August 18, 2017, the Secretary issued orders remanding both cases to the BHA for a hearing. (ALJ's Adjudication at 1.)

[3] In Finding of Fact 5, the ALJ incorrectly states that Child was seven years old at the time of the hearing; however, Child testified that she was six years old. *Compare* F.F. No. 5, *with* R.R. at 49a.

question, which contradicted her earlier statement in the forensic interview that Grandmother also hit her; however, the ALJ found that, in weighing the totality of the evidence, this did not "impugn her credibility with regard to the fact that [Father] hit her and it hurt because she misbehaved at school." (F.F. No. 62; ALJ's Adjudication at 14-15.)

An intake supervisor for CYF also testified at the hearing and clarified that the reason there were two reports stemming from the same incident was because Child's specific injury of bruising to the face was reported separately from her injuries of scratching on the face and bruising on the leg. The ALJ found the intake supervisor credible, but ultimately stated that listing Father twice for the same incident and the same category of abuse was "duplicative," and that CYF had not properly explained why both reports were necessary. (F.F. No. 63; R.R. at 92a-95a; ALJ's Adjudication at 18.)

The caseworker testified at the hearing and reiterated that on January 11, 2017, she interviewed Child, Child's mother and maternal grandparents, Father, and Grandmother and took two photographs of Child's injuries. With regard to the perpetrator of Child's injuries, the caseworker noted that Father had custody of Child from approximately January 6 to January 10, 2017, and that Child "stated that [the perpetrator] was [her] dad due to behaviors that she had at school." (R.R. at 116a.) The ALJ found the caseworker credible. (F.F. No. 64.)

Grandmother also testified at the hearing and stated that she did not hit Child, nor did she see Father hit Child. In pertinent part she stated,

> I was sick at the time anyway. From the time he got to my house and talked – I never really talked to him or anything. He came in, I guess, and he got her, and I literally went back to sleep. That was the only reason why I was home because I was sick at the time when I had to go pick her up.

6

So, I mean, I guess he talked to her. I mean, I guess he took her home. But I've never – I never seen any of it. That's why that night was – I mean, I don't know what had happened.

(F.F. No. 55.) The ALJ found "[Grandmother]'s testimony that she did not see what happened or know what happened was not credible." (F.F. No. 65.) The ALJ further noted that Grandmother "did not specifically support [Father]'s assertion that he did not hit the [] [C]hild, but rather, indicated she did not know if he hit [] [C]hild or not." (ALJ's Adjudication at 15.) Further, the ALJ stated,

> While [Grandmother] also did not directly contradict [Father]'s position and indicate he did hit [] [C]hild, the tone of her responses suggested she was bothered by being called as a witness by her son and did not want to be involved. If [Grandmother] was caring for or watching [] [C]hild, her equivocal testimony as to [Father] picking [] [C]hild up is peculiar. The person charged with watching a then 5 year-old should have some awareness of when that child is leaving her care. Additionally, [] [C]hild disclosed at the forensic interview that her grandmother had hit her that day also. This disclosure (if accurate) provides a possible motive for [Grandmother] to be less than truthful (other than the motive of protecting her son).

(ALJ's Adjudication at 15.)

Finally, Father testified at the hearing and acknowledged he "open-hand" spanked Child on her buttocks as a means of physical discipline, but emphasized he did not strike her in the face or punch her in the leg. (F.F. No. 56.) Father suggested that Child's statements may have been influenced by her mother or maternal grandparents and stated his belief that CYF did not do enough to investigate whether Child's injuries occurred at school or on the school bus because there were other recent incidents where Child was hit and "attacked by other kids." (R.R. at 137a.) Father stated that, if he had hit Child, she would have been more seriously

7

injured and that, if he had caused the scratches on her face and bruising on her thigh, he would not have sent her to school.  Father also speculated that Child's injuries could have been related to her eczema, which caused her to scratch her skin, but acknowledged that he agreed with Dr. Udekwu's testimony, which ruled out eczema as a cause of the injuries.[4]  (ALJ's Adjudication at 15.)

The ALJ found Father's "testimony that he did not hit [] [C]hild in the face or thigh was not credible." (F.F. No. 66.)  The ALJ deemed Father's testimony consistent but self-serving and unconvincing.  She found Father's statement that Child would have been more severely injured if he had hit her not credible or convincing because "he could strike her anywhere on the spectrum from very gently to very forcefully."  (ALJ's Adjudication at 15.)  The ALJ noted Father's admission that he spanked Child on her bottom but noted that no serious injuries to Child's bottom were observed.  Further, the ALJ observed, "the notion that he would not have sent her to school after hitting [Child] is not convincing" because Father acknowledged "he did not really 'examine her'[5] every day, so he may not have

---

[4] In support of his arguments, Father sought to enter into the record printouts of text messages between Child's mother and himself discussing Child's intense scratching of her legs due to eczema that was causing her to bleed, as well as a school evaluation documenting Child's numerous instances of behavioral issues, including frequent incidents involving physical violence with other children and adults, which appeared to corroborate his testimony that Child had had behavioral issues "since kindergarten," and that she would "hit adults," "hit children," "hit who[m]ever." (R.R. at 139a.)  The ALJ, however, sustained CYF's objections to all documents.

[5] On this point, Father  stated the following:

> [A]s a parent, I understand we examine our children, but do I necessarily examine her every single day?  No.  If she has a concern, she tells me, whether it's something on her leg or a bump, then I will examine it.  But, I mean, for the most part, because she's a little girl – I live by myself.  There's no other woman in the house.  You know,

**(Footnote continued on next page…)**

noticed that she had visible marks as a result of being hit." *Id.* (quoting R.R. at 138a.) The ALJ stated that Father's "version of events contradicted [] [C]hild's version, and he had no specific explanation for her injuries. . . . [O]ther than [Father]'s speculation, there is no real evidence that eczema or other children caused the marks, only [Father]'s uncorroborated testimony." (ALJ's Adjudication at 15.) Thus, the ALJ found Father's testimony that he did not hit Child on the face or thigh not credible. *Id.*

In her reasoning, the ALJ first observed that Child, who was five years old at the time of the incident, met the definition of a child under the Law and that Father, as Child's parent, was eligible to meet the definition of a perpetrator under the Law. 23 Pa.C.S. §6303(a). Next in examining whether Father caused bodily injury to Child by a recent act, the ALJ noted that bodily injury is defined as an injury that causes "impairment of physical condition or substantial pain." *Id.* In reviewing the evidence, the ALJ found that Father struck Child on the face and thigh on January 10, 2017, causing Child substantial pain at the time and, thus, bodily injury to Child. Because the reports of abuse were made within one day of the act in question, the ALJ found the act was recent under section 6303(a) of the Law.

With regard to the scratches on Child's face, however, the ALJ would not attribute them to Father, stating,

> The cause of the scratching was not specifically addressed in the hearing. Slapping could cause bruising, but generally

---

**(continued…)**

> for her own privacy reasons, I don't necessarily check her body out every single day.

(R.R. at 138a.)

9

would not cause scratches. While it is within the realm of possibility that the slapping would cause scratches if [Father] hit [] [C]hild in a specific way, this was not sufficiently explained. [CYF] did not present substantial evidence to demonstrate that [Father] was the cause of the scratches on [] [C]hild's face.

(ALJ's Adjudication at 16.)

Having determined that Father caused bodily injury to Child by a recent act,[6] the ALJ next examined whether Father's actions were a reasonable use of force for the purpose of corporal punishment, which is allowable under section 6304(d) of the Law. 23 Pa.C.S. §6304(d) ("Nothing in this chapter shall be construed to restrict the generally recognized existing rights of parents to use reasonable force on or against their children for the purposes of supervision, control and discipline of their children. Such reasonable force shall not constitute child abuse."). The ALJ noted that it was undisputed Child was sent home from school on the day of the incident for bad behavior and that the "bodily injury [Father] caused to [] [C]hild was inflicted as corporal punishment for her behavior." (ALJ's Adjudication at 17.) Thus, the ALJ stated that the issue was "whether the force [Father] used was reasonable, and constitute[d] incidental, minor or reasonable physical contact." *Id.*

In analyzing this question, the ALJ noted that there was no dispute that Child's behavior on the day of the incident was so poor that the school forced her to leave for the day, and stated that it would be reasonable for a parent "to impose some significant punishment for such behavior." *Id.* The ALJ acknowledged that, while Child suffered substantial pain at the time she was hit, "a goal of corporal punishment is to inflict pain, [which] is allowable under the [Law]." *Id.* Further, the ALJ

---

[6] Per the findings of fact, these acts were: "smack[ing] her in the face," "hit[ting] [] [C]hild on the thigh with his hand," "pinch[ing] her leg in the car," and "beating" and "smack[ing] her on the butt." (F.F. Nos. 12-15.)

10

observed that Child's pain had subsided by the time she presented to the doctor the next day; Dr. Udekwu noted Child's face was not tender; no evidence of physical impairment was presented; and Child was able to attend (and Father sent her to) school the following day. "The lack of lasting physical symptoms," according to the ALJ, was "evidence [Father] did not use excessive force and that the force he used in administering corporal punishment was reasonable." *Id.*

With regard to the photographs of Child's injuries, the ALJ determined that they were not "convincing" of excessive force because the photograph of Child's thigh showed only a "minimal mark," and the photograph of Child's face, while showing more significant injuries, "still only depict[ed] some dark redness and scratching (which, again, has not been sufficiently explained as attributable to [Father])." *Id.* On this point, the ALJ noted that Child's statement in the forensic interview that Grandmother also hit her, if true, might mean that Grandmother was responsible for some of the injuries in the photographs. However, the ALJ clarified that "[t]he determination as to whether [Grandmother] did hit [] [C]hild need not be made though, because even if [Father] caused all the injuries visible in the photographs while he administered corporal punishment, the injuries depicted are still not extensive such that proof of unreasonable force is seen." (ALJ's Adjudication at 17-18.)

Ultimately, the ALJ found that Father's actions were excluded from the Law's definition of Child abuse and recommended that Father's appeal be sustained. The BHA adopted the ALJ's recommendation in its entirety, and CYF filed a petition for review with this Court.

11

## Discussion

On appeal,[7] CYF argues that the ALJ erred in applying the exclusions for child abuse under section 6304 of the Law when Father did not testify that Child was injured due to being disciplined. CYF also argues that the ALJ erred in finding that reasonable force was used where Child suffered bodily injury and substantial pain. Additionally, CYF contends that the ALJ did not use the proper criminal negligence standard in evaluating Father's actions.

In response, the Department argues the BHA did not err in finding Father had not abused Child simply because he denied hitting her on her face and thigh. The Department also argues that Father properly raised the corporal punishment exception and that the BHA did not err in finding that CYF failed to show the amount of force was unreasonable.

The county agency has the burden of proving the accuracy of the indicated report. 23 Pa.C.S. §6341(c); *R.J.W. v. Department of Human Services*, 139 A.3d 270, 282 (Pa. Cmwlth. 2016). "[I]n an expunction hearing the standard of proof is preponderance of the evidence, and the statutory standard for the evidence is '[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion. 23 Pa.C.S. § 6303(a).'" *A.P. v. Department of Public Welfare*, 98 A.3d 736, 742-43 (Pa. Cmwlth. 2014).[8] In order

---

[7] This Court's scope of review is limited to determining "whether constitutional rights have been violated, whether the adjudication is in accordance with the law, or whether necessary findings of fact are supported by substantial evidence." *Beaver County Children & Youth Services v. Department of Public Welfare*, 68 A.3d 44, 47 n.4 (Pa. Cmwlth. 2013).

[8] In *A.P.*, we addressed the Supreme Court's decision in *G.V. v. Department of Public Welfare*, 91 A.3d 667 (Pa. 2014), which

**(Footnote continued on next page…)**

12

for the factfinder to reach a conclusion of abuse, "the 'evidence must so preponderate in favor of a conclusion that it outweighs . . . any inconsistent evidence and reasonable inferences therefrom.'" *R.J.W.*, 139 A.3d at 282 (quoting *In re S.H.*, 96 A.3d 448, 453 n.4 (Pa. Cmwlth. 2014)). When performing this "weighing dynamic," the factfinder must make and explain credibility determinations, and weigh the evidence "with reference to demeanor and substance of the testimony and all other evidence to enable meaningful appellate review." *A.P.*, 98 A.3d at 744-45. Whether the evidence satisfies the statutory standard is a question of law. *Id*. at 744.

The Secretary of the Department (or the Secretary's designee) is the ultimate factfinder in determining whether an indicated report has been proven accurate, *City of Philadelphia, Office of Children, Youth & Family Services v. Department of Public Welfare*, 767 A.2d 10, 12 (Pa. Cmwlth. 2001), and, as such, is free to accept or reject the testimony of any witness, either in whole or in part, *DePaolo v. Department of Public Welfare*, 865 A.2d 299, 305 (Pa. Cmwlth. 2005). In determining whether a finding of fact is supported by substantial evidence, the

---

**(continued…)**

> cautioned against conflating the statutory standard at 23 Pa.C.S. §6303(a) with the "substantial evidence standard prevailing on appellate review under Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704." *Id.* at 674 (Saylor, J., concurring). Justice Saylor [ ] explained the material difference. The statutory standard incorporates a "weighing dynamic." *Id.* "Traditional appellate substantial-evidence review, on the other hand, omits all such weighing—instead, this deferential form of review entails only an examination of whether the evidence, viewed in a light most favorable to the prevailing party, is adequate to support the administrative agency's factual findings." *Id.*

*A.P.*, 98 A.3d at 742.

Court is required to give the party in whose favor the decision was rendered "the benefit of all reasonable and logical inferences that may be drawn from the evidence of record." *S.T. v. Department of Public Welfare, Lackawanna County Office, Children, Youth & Family Services*, 681 A.2d 853, 856 (Pa. Cmwlth. 1996). Further, because determinations regarding credibility and weight of the evidence are for the factfinder, we will not disturb those determinations absent an abuse of discretion. *See R.J.W.*, 139 A.3d at 287.

Section 6303(b.1) of the Law defines "child abuse," in relevant part, as intentionally, knowingly or recklessly "[c]ausing bodily injury through any recent act or failure to act." 23 Pa.C.S. §6303(b.1). Bodily injury is defined as "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S. §6303(a). However, section 6303(d) of the Law clarifies that the "term 'child abuse' does not include any conduct for which an exclusion is provided in section 6304 (relating to exclusions from child abuse)." 23 Pa.C.S. §6303(d).

In pertinent part, section 6304(d) states, "Nothing in this chapter shall be construed to restrict the generally recognized existing rights of parents to use reasonable force on or against their children for the purposes of supervision, control and *discipline of their children*. Such reasonable force shall not constitute child abuse." 23 Pa.C.S. §6304(d) (emphasis added).

In its first argument, CYF notes that, although courts of this Commonwealth have upheld appeals of parents who injured their children through use of corporal punishment, such is not the case here because Father denied causing the specific injuries to Child at issue during the course of administering corporal punishment. CYF contends that Father did not raise the exclusion for corporal punishment and it was inappropriate for the ALJ to do so *sua sponte*.

14

In response, the Department states that, given the ALJ's finding that Father was not credible and that he was the person who caused Child's injuries, it would have been improper for the ALJ not to consider the corporal punishment exclusion in determining whether Father perpetrated child abuse. The Department contends that "[t]his is a clear case of corporal punishment," and because Father asserted corporal punishment was the reason for his spanking Child, it was not an error of law for the ALJ to also consider whether his actions in striking her face and thigh were also part of his disciplining of Child. While CYF contends that Child's "injuries were the result of reckless conduct from an angry reaction" by Father (CYF's Br. at 13), the Department observes that CYF did not present any evidence that Father's "conduct of spanking, striking, and/or hitting was for a purpose other than discipline," (Department's Br. at 10).

Notably, Father appeared at the hearing *pro se*, and the ALJ, giving due regard for his *pro se* status, considered whether corporal punishment also was the cause of Child's injuries where Father asserted he did "open-hand" spank Child on her bottom for her bad behavior, although this did not cause any apparent injury. We disagree with CYF that this amounted to an error of law. Furthermore, we note that there were various references by witnesses throughout the hearing to the fact that Father was using corporal punishment to discipline Child for her conduct that day, as he had in the past. Such statements include Child's testimony that Father was the one who caused her injuries "due to behaviors she had at school," (R.R. at 116a), and that Father "start[ed] smacking me because I was being bad," (R.R. at 59a). Moreover, in the first sentence of his argument at the hearing, Father stated, "So to start out regarding this incident, as I mentioned to [CYF], I did physically discipline her," (R.R. at 135a), and subsequently testified, "Yes, I did spank her . . . ," and that "if me

15

[sic] or [Child's] mother feels like [Child] needs to be disciplined . . . for whatever reasons . . . we know we open-hand spank her on her butt[;] we've always known that," (R.R. at 140a).[9]

As such, we agree with the Department that it was entirely appropriate for the ALJ to consider whether Father inflicted Child's injuries during the administration of corporal punishment of Child as a means of disciplining her for her poor behavior at school.

We next consider whether the ALJ erred in finding that Father's acts were excluded from the definition of child abuse because Father used reasonable force in his corporal punishment of Child. CYF argues this case is analogous to *F.R. v. Department of Public Welfare*, 4 A.3d 779, 782-84 (Pa. Cmwlth. 2010),[10] in which a father spanked his ten-year-old son on his buttocks with an open hand multiple times to discipline him for throwing away a reading assignment and lying about it, causing him severe pain and bruising that was visible in photographs taken a week after the incident. On appeal before this Court, we affirmed the Department's order denying expungement, holding that the ALJ properly applied the correct standard for

---

[9] Notably, Child corroborated this statement during the hearing when she testified that Father "smacked me on the leg, and then when we got home, he started smacking my butt." (R.R. at 62a.)

[10] As this Court noted in *Children and Youth Services for County of Berks v. Department of Human Services* (Pa. Cmwlth., No. 1175 C.D. 2017, filed May 7, 2018), slip op. at 11, "Although decided under a prior version of the [Law] (which defined 'child abuse' using the term 'non-accidental' and 'serious physical injury' rather than 'intentionally, knowingly or recklessly' and 'bodily injury'), this Court's prior decision in *F.R. v. Department of Public Welfare*, 4 A.3d 779 (Pa. Cmwlth. 2010), is helpful to our analysis."

corporal punishment cases, the criminal negligence standard,[11] which requires the abusive act that caused the bodily injury to be committed "with disregard of a substantial and unjustifiable risk." *Id.* at 787. We noted the ALJ's finding that the father, while not acting with malicious intent, nonetheless "lost control of his emotions" and caused his son's injuries while disregarding a substantial and unjustifiable risk to his son. *Id.* at 788.

CYF argues this case mirrors *F.R.* in that Father's actions caused Child substantial pain. Without citation to anything in the record indicative of Father's emotions when he struck Child, CYF asserts that "[j]ust like the father in *F.R.*, the father in the present case, [Father], lost control of his emotions and 'disregarded a substantial and unjustifiable risk' when he struck [Child] in the face and then pinched her leg in the car." (CYF's Br. at 14) (quoting *F.R.*, 4 A.3d at 788). CYF continues, "Father's actions were that of one losing control and not one of discipline. His actions met the definition of criminal negligence and as such, application of the exclusions under 23 Pa. C.S. §6304 was an error of law and the order must be reversed." (CYF's Br. at 14.) Finally, without any elaboration, CYF argues that "the ALJ failed to use the standard of criminal negligence. She failed to view [F]ather's action *in toto.*" *Id.*

In response, the Department distinguishes *F.R.* on the basis that Child's injuries here were far less significant and argues that the mere fact Child suffered substantial pain at the time of the corporal punishment does not mean Father used unreasonable force. The Department analogizes this case to *W.S. v. Department of Public Welfare*, 882 A.2d 541 (Pa. Cmwlth. 2005), where a father disciplined his

---

[11] *See* discussion of *P.R. v. Department of Public Welfare*, 801 A.2d 478 (Pa. 2002), *infra* at pp. 18-19.

17

teenage daughter for her continuous misconduct by slapping her ear two to three times, subsequently resulting in a 20-decible short-term hearing loss in that ear. The Secretary of the Department of Public Welfare, now the Department of Human Services, denied the father's appeal, but on appeal to this Court, we reversed. This Court held that the father's conduct "did not rise to the level of criminal negligence and [could not] be viewed as a gross deviation from the standard of care a reasonable parent would observe in the same situation," noting that the evidence showed the father was a concerned parent who tried everything in his means to control his child and that, while he was upset at the time, he had demonstrated self-control by walking away from the situation after he made physical contact. *Id.* at 548.

The Department contends that this Court should apply the same reasoning as in *W.S.* and conclude that Father did not commit child abuse against Child when she had only minor abrasions and bruising one day later. Notably, the Department does not address whether or not the ALJ applied the correct standard in evaluating Father's behavior.

In *P.R. v. Department of Public Welfare*, our Supreme Court set forth the standard in cases where a child suffers a serious injury arising from the administration of corporal punishment.

> A finding of abuse begins with the discovery that a child has suffered a serious injury. The investigation then goes in reverse in an effort to ascertain how and why that injury occurred. The most common initiation point is the administration of corporal punishment. Hon. Leonard P. Edwards, *Corporal Punishment and the Legal System*, 36 SANTA CLARA L.REV. 983 (1996). Any definition of child abuse that arises by defining that term in contrast to accident must incorporate the reality that corporal punishment is undertaken with intent. Corporal punishment at its core embodies intent to inflict pain. *See L.A.J.*, 726

A.2d at 1136. Thus, the legislature could never have meant the term accident to be defined within the [Law] by focusing solely on the intent of the perpetrator. The tension in resolving cases where a parent or guardian is accused of child abuse when an act of corporal punishment results in a serious injury must be acknowledged. Undoubtedly, the legislature recognized this dilemma when drafting the definition of child abuse at issue. To balance the competing objectives of protecting children from abuse while maintaining the parental right to use corporal punishment, the legal standard for differentiating abuse from accident must acknowledge some level of culpability by the perpetrator that his actions could reasonably create a serious injury to the child. The standard that best comports with the problem of defining abuse in terms of nonaccidental injury is criminal negligence.

Criminal negligence intertwines the concepts of foreseeability and intent to a degree that this court finds appropriate for differentiating cases of accidental and nonaccidental injury in keeping with the legislative directive contained within the [Law]. The legislature has defined criminal negligence as follows:

> A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and intent of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b)(4). This definition satisfies the parameters of defining an injury caused by abuse as something that occurs in contrast to an injury caused by accident. Accordingly, we hold that in cases where a child suffers a serious injury arising from the administration of corporal punishment, a finding that the injury resulted from abuse versus accident will depend upon a showing, by the

19

agency, through substantial evidence, that the injury resulted from criminal negligence.

*P.R.*, 801 A.2d at 486-87. Subsequently, in *F.R.*, this Court recognized that, after *P.R.* was decided, the legislature amended the Law by codifying the criminal negligence standard "under the auspices of the definition of 'non-accidental.'" *F.R.*, 4 A.3d at 787. Although the term "non-accidental" no longer appears in the Law, the criminal negligence standard remains the proper standard to be used in corporal punishment cases in that *P.R.* remains binding precedent.

Notably, however, in 2014, the legislature amended the Law to include section 6304(d), which codifies the right of parents to use reasonable force in the administration of corporal punishment of their children:

> **(d) Rights of parents**.--Nothing in this chapter shall be construed to restrict the generally recognized existing rights of parents to use reasonable force on or against their children for the purposes of supervision, control and discipline of their children. Such reasonable force shall not constitute child abuse.

23 Pa.C.S. §6304(d).

To date we observe that the reconciliation of these two standards in the context of corporal punishment has not yet been addressed by this Court. Since we must read these two precepts harmoniously if possible, giving meaning to both, we conclude that, in determining whether a parent's force was reasonable under section 6304(d) of the Law, the factfinder must apply the criminal negligence standard set forth in *P.R.* Accordingly, we hold that, in cases where the child's injury arises from the administration of corporal punishment, the factfinder must make a determination as to whether the force used was "reasonable force," 23 Pa.C.S. §6304(d), and in doing so, must consider whether the parent was criminally negligent in that he

20

disregarded a substantial and unjustifiable risk or deviated from a standard of care that a reasonable person would observe in his situation, *see P.R.*, 801 A.2d at 487.

Here, as noted above, the ALJ determined that CYF failed to meet its burden to present substantial evidence to support the indicated reports of child abuse against Father because his use of corporal punishment did not constitute child abuse in that it was reasonable under section 6304 of the Law. In her adjudication, however, the ALJ makes no reference to the criminal negligence standard. Thus, although the ALJ applied the section 6304 reasonableness standard, the ALJ did not apply the criminal negligence standard set forth by the Supreme Court in *P.R.* Nonetheless, we conclude that it is not necessary to vacate and remand to allow the Department to issue a new determination because the determination of whether Father was criminally negligent is a legal conclusion and we are satisfied that the evidence of record in this case does not meet the criminal negligence standard. *See, e.g.*, *D.S. v. Department of Public Welfare* (Pa. Cmwlth., No. 1980 C.D. 2011, filed September 17, 2012) (This Court applied our recently-developed, but later struck down, clear and convincing standard to the facts of the case although the ALJ had not done so: "[W]e conclude that it is not necessary to vacate and remand to allow the Department to issue a new determination . . . because the evidence of record in this case satisfies the clear and convincing standard."); *A.S. v Department of Public Welfare* (Pa. Cmwlth., No. 148 C.D. 2012, filed December 14, 2012) (same).[12] Here, the facts as found by the ALJ indicate that Father did not disregard a substantial and unjustifiable risk or deviate from the standard of care that a reasonable person would

_____

[12] Pursuant to Commonwealth Court Internal Operating Procedure Section 414(a), 210 Pa. Code §69.414(a), an unreported Commonwealth Court panel decision issued after January 15, 2008, may be cited for its persuasive value, but not as binding precedent.

observe in his situation by taking the actions he took.[13]  As such, we agree with the Department that Father did not use unreasonable force in administering corporal punishment.

Accordingly, for all of these reasons, the final order of the BHA is affirmed.

_____
PATRICIA A. McCULLOUGH, Judge

---

[13] We take note that traditional acts of corporal punishment might include a form of spanking, slapping, or pinching but, as the ALJ did in this case, the factfinder must look at the specific circumstances of the case and determine if the corporal punishment was done in a manner that was unreasonable and, further, consider whether the actions were criminally negligent.

Moreover, we observe that both this Court and the Supreme Court have sustained appeals of parents who injured their children far more severely and who used items to punish their children that, it would seem, had the capacity to inflict far more damage than an open hand.  See *P.R.*, 801 A.2d at 480 (use of a belt with a buckle to administer spanking that inadvertently hit the child's eye and required surgery); *W.S.*, 882 A.2d at 541 (slapping child's ear causing short-term hearing loss, bruising, swelling, redness); *Children and Youth Services for County of Berks* (Pa. Cmwlth., No. 1175 C.D. 2017, filed May 7, 2018) (hitting child with a wooden stick and breaking it on the child's leg causing a bruise).

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Allegheny County Office of Children, :
Youth and Families, :
         Petitioner :
          : No.  211 C.D. 2018
      v. :
          :
Department of Human Services, :
         Respondent :

## _ORDER_

AND NOW, this 4th day of January, 2019, the January 23, 2018 final order of the Department of Human Services' Bureau of Hearings and Appeals is hereby affirmed.

_____
PATRICIA A. McCULLOUGH, Judge